Odell **BARNES**, Jr., Appellant,

v.

**The STATE of Texas, Appellee.**

No. 71291.

Court of Criminal Appeals of Texas, En Banc.

Feb. 9, 1994.

Rehearing Denied March 23, 1994.

Reginald R. Wilson, Marty Cannedy, Wichita Falls, for appellant.

Barry L. Macha, Dist. Atty., and John W. Brasher, Asst. Dist. Atty., Wichita Falls, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

PER CURIAM.

Appellant was convicted of the offense of capital murder under V.T.C.A. Penal Code, § 19.03(a)(2). The offense originated in Wichita County, where appellant was indicted. Pursuant to defense motion, venue was changed to Lubbock County. The jury answered the special issues affirmatively and punishment was assessed accordingly at death. Article 37.071(b), V.A.C.C.P.[1] Appeal to this Court is automatic. Article 37.-071(h). Appellant raises fifteen points of error. We will affirm.

### Sufficiency of the Evidence

In his fourth point of error, appellant contends that the evidence is insufficient to establish his guilt. In his fifth point of error, he asserts that the evidence is insufficient to establish any of the aggravating circumstances required to raise murder to a capital offense, in this case, burglary or robbery.[2] He further argues the evidence is insufficient

to show appellant intended to cause the death of Helen Bass.

The evidence at trial established the following: Bass returned home from work at approximately 11:30 p.m. on November 29, 1989. The next day, Mary Barnes, appellant's mother and Bass' friend, went to Bass' home to pick her up for work. No one answered the door. After arriving at work Barnes became concerned and phoned Sharon Mergerson, Bass' neighbor and ex-sister-in-law, to check on the situation. Mergerson immediately went to Bass' home. Upon arrival, she noticed a back door had been forcibly kicked in. She found Bass' body at approximately 4:00 p.m. Mergerson went home and phoned the police.

Bass died of a .32–caliber gunshot wound to the head. Time of death was estimated to be in the early morning hours of November 30th. She was found naked and beaten in her bedroom. Aside from the gunshot wound, Bass had been stabbed twice, hit with a .22–caliber rifle, and struck in the head with a blunt object. A knife covered with blood was discovered in Bass' kitchen. A bloody lamp with a dent in the base was found in Bass' bedroom, along with a .22–caliber rifle that had been broken in half. The police discovered the lamp's mate in another bedroom of the home. Mergerson testified that the lamps had been recently purchased. A box for a .32–caliber handgun was also found. However, no gun was recovered at the scene.

Bass did own a .32–caliber handgun. Willie Bass, Jr., her son, bought her the handgun in April, 1988.[3] Malrie Wilson, Bass' friend, saw the gun in her possession on the morning of November 29th. Wilson had shown Bass how to load the weapon and was attempting to familiarize her with it on Monday, November 27th, and Wednesday, No-

---

1. Unless otherwise indicated, all references to articles are to those in the Texas Code of Criminal Procedure.

2. In appellant's indictment it was alleged he committed murder in the course of committing burglary, robbery, and aggravated sexual assault. V.T.C.A. Penal Code, § 19.03(a)(2). At trial, however, the trial court instructed the jury as to

the aggravating offenses of robbery and burglary only.

3. The transaction papers filled out when Willie Bass purchased the gun list the gun's serial number as NB003602. The gun recovered by the police, see text *post*, bears the same serial number.

vember 29th. The gun was fully loaded at that time. Wilson had suggested Bass keep the gun in her bedroom.

Bass' bedroom was found in disarray. Dresser drawers had been moved and some pulled out. The contents of two purses had been dumped out onto the bed. Bass' checkbook was on the floor. A coin purse was found open. A jewelry box was open and appeared to have been gone through. An identification card and personal papers belonging to Bass were found outside near her chain-link fence. Approximately $200 cash was also found in the home.

Johnny Ray Humphrey, appellant's coworker, had been with appellant at approximately 10:00 p.m. on November 29th, when he dropped appellant off near his home. Appellant was wearing dark-colored coveralls. At approximately 10:30 p.m., Robert Brooks, a neighbor, saw appellant in Bass' yard. Appellant hurdled Bass' wooden fence, fell down, and rolled into the street. Appellant then got up and went back over Bass' chain-link fence.[4] Brooks testified appellant was wearing dark green or blue coveralls and a stocking cap. Between 2:00 a.m. and 3:00 a.m. on November 30th, Patrick Williams saw appellant with a gun and wearing coveralls at the Holliday Creek Apartments. The apartments are near Bass' home.

After work on November 30th, Humphrey, appellant, and Joseph Barnes, appellant's brother, stopped by the Barnes' home. Appellant stated he had "confiscated" a gun from his father and wished to sell it. Appellant went to his bedroom, retrieved the gun from under his bed, and gave it to Humphrey. Humphrey later sold the gun to Williams. Humphrey identified the gun at trial as the one he obtained from appellant.

Williams testified that the gun that he bought from Humphrey on the afternoon of November 30th was the same one he had seen appellant with earlier the same day. He further stated that a bullet was missing

from the gun when he purchased it. Williams later returned the gun to Humphrey's sister, Deborah Ann, when he learned of the murder. Deborah Ann then turned the gun over to the police. Willie Bass identified the gun as the one he had given his mother.

The police recovered dark green coveralls from Joseph Barnes' car. Joseph told the officers that the coveralls belonged to appellant.[5] Humphrey testified that the coveralls were the same coveralls he had seen appellant wearing on the evening of November 29th. Blood later removed from the coveralls by a forensic serologist was determined to be type O blood, which was the same as Bass'. Appellant has type A blood. The forensic serologist testified that fifty percent of all African–Americans have type O blood.[6] The blood on the coveralls, however, also had genetic markers consistent with Bass' blood.

Larry Fletcher, a firearms examiner, testified the bullet removed from Bass' head was the same type that would be fired from the .32–caliber revolver in evidence. When comparing the fatal bullet to a test bullet fired from the revolver, Fletcher could not make a positive determination whether or not the fatal bullet was fired from this exact pistol, because it sustained too much damage on impact. However, there were other consistencies between the test bullet and the one removed from Bass.

Dr. Jeffrey Barnard, Chief Medical Examiner of Dallas County, performed the autopsy. Barnard testified that Bass' injuries were consistent with having been caused by the handgun, lamp, broken rifle, and knife recovered by the police. James Cron, a fingerprint and footprint expert, testified that appellant's fingerprint appeared on the lamp. Further, he stated that the shoeprint pattern found on the back of Bass' checkbook matched the shoe pattern on appellant's shoes. Cron admitted that millions of shoes with that pattern have been produced.

---

4. Bass had both a wooden and a chain-link fence on different parts of her property.

5. Joseph testified that he believed the coveralls actually belonged to his father, but that appellant "wore them all the time."

6. Bass was an African–American.

■ In reviewing a sufficiency question, we must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Butler v. State,* 769 S.W.2d 234, 238 (Tex.Cr.App.1989). Because the State's case is based on circumstantial evidence and was tried prior to this Court's decision in *Geesa,*[7] we will use the "exclusion of reasonable hypotheses" approach as the method for analyzing sufficiency. *Garrett v. State,* 682 S.W.2d 301, 304 (Tex.Cr.App.1984), *cert. denied,* 471 U.S. 1009, 105 S.Ct. 1876, 85 L.Ed.2d 168 (1985). It is not necessary that every fact point directly and independently to the defendant's guilt. *Russell v. State,* 665 S.W.2d 771, 776 (Tex.Cr.App.1983), *cert. denied,* 465 U.S. 1073, 104 S.Ct. 1428, 79 L.Ed.2d 752 (1984). It is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Id.*

■ Appellant contends that the presence of his fingerprint on the lamp does not show he had ever been in decedent's home unlawfully.[8] He argues the presence of his fingerprint was not unusual because he had helped do repair work on Bass' home three years before and Bass had allowed appellant to have a party in another building on her property. Appellant's mother testified that appellant had done work for Bass a few weeks before her death. Appellant cut down some limbs and looked for a leak in the back of the house. There is evidence, however, that the lamps were purchased shortly before Bass' death, and were kept in a front bedroom.

■ Appellant next argues that Humphrey fabricated his testimony and implicated appellant in order "to avoid his own date with the hangman." Appellant supports this hypothesis with the following evidence at trial: Marquita Mackey testified that she saw Humphrey at 5:00 p.m. on November 30, 1989, wearing a pair of blood-stained dark coveralls. Humphrey had the gun with him at the time and he delivered it to Williams in her presence. She also stated that she later saw the coveralls thrown behind a local playhouse. Mary Barnes testified appellant arrived home between 11:45 and 11:50 p.m. on November 29th and did not leave the house until the next morning, although she admits that she was asleep for part of that time. Joseph Barnes testified that appellant did not go into his home on November 30th and retrieve the gun. He testified that Humphrey got a paper sack from his own home and then traded it with someone at the Holliday Creek Apartments.

The jury is the exclusive judge of the credibility of witnesses and of the weight to be given their testimony. *Lafoon v. State,* 543 S.W.2d 617, 620 (Tex.Cr.App.1976). Appellant's argument that Humphrey was the real perpetrator of the crime was apparently rejected by the jury. We must hold the evidence sufficient if the exculpatory aspects of appellant's version of events necessarily contradict or conflict with inculpatory inferences drawn from other circumstantial evidence presented by the State, and when all the evidence viewed in the light most favorable to the verdict would rationally support a jury verdict of guilt to a degree of confidence beyond a reasonable doubt. *Gunter v. State,* 858 S.W.2d 430, 439 (Tex.Cr.App.), *cert. denied,* — U.S. —, 114 S.Ct. 318, 126 L.Ed.2d 265 (1993). *Girard v. State,* 631 S.W.2d 162, 164 (Tex.Cr.App.1982). The combined and cumulative force of all the incriminating·circumstances leads us to conclude that there was sufficient evidence for any rational trier of fact to conclude beyond a reasonable doubt that appellant was guilty

---

7. *Geesa v. State,* 820 S.W.2d 154 (Tex.Cr.App. 1991).

8. Appellant also argues that his presence outside of a house thirty minutes before a crime occurs does not lead ineluctably to his guilt. Further, he argues that the footprint on the checkbook and blood on the coveralls are inconclusive pieces of evidence. In reviewing the evidence it is proper to consider the events that occurred before, during, *and* after the commission of the offense. (emphasis added). *Thompson v. State,* 697 S.W.2d 413, 416 (Tex.Cr.App.1985). It is enough if the conclusion of guilt is warranted by the combined and cumulative force of all the incriminating circumstances. *Russell,* 665 S.W.2d at 776.

of capital murder, and to exclude every other reasonable hypothesis except for that of guilt. *Russell*, supra, at 776; *Johnson v. State*, 803 S.W.2d 272, 280 (Tex.Cr.App.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2914, 115 L.Ed.2d 1078 (1991), *overruled on other grounds, Heitman v. State*, 815 S.W.2d 681 (1991).

■ Appellant separately contends that the State offered no evidence to prove appellant intended to cause Bass' death. The record shows that Dr. Barnard, testified the gunshot wound sustained by Bass was a "contact wound." He stated a contact wound occurs when the barrel of a gun is in contact or almost in contact with the victim's skin at the time the gun is fired. Further evidence was brought in showing that the gun had been fired through two pillows placed closely to Bass' head. Her head had also been wrapped in a shirt after the beatings, but prior to the gunshot wound. Dr. Bernard testified this would prevent blood from splattering. The jury could infer that the firing of the gun through two pillows and a shirt would muffle the sound of the shot and prevent blood from splattering. Further, the jury could infer that appellant would not fire a gun at such a close range to Bass' head unless he intended to kill her. Viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could have accepted these inferences and from them found the element of intent beyond reasonable doubt. *See Jackson v. Virginia*, 443 U.S. at 319, 99 S.Ct. at 2789. We overrule points of error four and five.

■ Appellant's eighth point of error contends that the evidence was insufficient for the jury to make an affirmative finding that he would be a "continuing threat to society." Article 37.071(b)(2) (second special issue). He argues that of the eight factors listed in *Keeton v. State*, 724 S.W.2d 58, 61 (Tex.Cr. App.1987), most should be decided in his favor.

■■ In reviewing the sufficiency of the evidence at the punishment phase, we again view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could make the finding beyond a reasonable doubt. *See Stoker v. State*, 788 S.W.2d 1, 7 (Tex.Cr.App.1989), *cert. denied*, 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 333 (1990). The burden was on the State to prove the punishment issues beyond a reasonable doubt. Article 37.071(c). A jury is permitted to consider a variety of factors when determining whether a defendant will pose a continuing threat to society. Among those factors are:

1. the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties;

2. the calculated nature of the defendant's acts;

3. the forethought and deliberateness exhibited by the crime's execution;

4. the existence of a prior criminal record, and the severity of the prior crimes;

5. the defendant's age and personal circumstances at the time of the offense;

6. whether the defendant was acting under duress or the domination of another at the time of the offense;

7. psychiatric evidence; and

8. character evidence.

*Keeton*, 724 S.W.2d at 61. As appellant admits, this list is not exhaustive.

Appellant argues that the evidence produced at trial did not show that appellant's killing of decedent was calculated or deliberate. He contends that the State's evidence at the punishment phase did not show that his past crimes were violent because no one was hurt and, in one instance, the gun used was not real. He further notes that the record is bare of psychiatric evidence. He asserts that the fact that he came from a broken and abusive home and that he was capable of remorse over his past misdeeds should weigh in his favor.

In its determination of the special issues, the jury was entitled to consider all the evidence presented at the guilt/innocence phase of the trial, in addition to the evidence presented at the punishment phase. *Valdez v. State*, 776 S.W.2d 162, 166–67 (Tex.Cr.App. 1989), *cert. denied*, 495 U.S. 963, 110 S.Ct. 2575, 109 L.Ed.2d 757 (1990). The circumstances of the offense and the events sur-

rounding are sometimes sufficient in themselves to sustain a "yes" answer to the second special issue. *See Vuong v. State,* 830 S.W.2d 929, 935 (Tex.Cr.App.), *cert. denied,* —— U.S. ——, 113 S.Ct. 595, 121 L.Ed.2d 533 (1992); *Stoker,* 788 S.W.2d at 7. The evidence in the instant case revealed that appellant murdered Bass in the course of robbery or burglary. She was beaten and stabbed, and then shot point blank through the head in a calculated fashion. Although we hesitate to conclude this evidence alone would support a finding of future dangerousness, there was more.

At the punishment phase of trial, the State introduced evidence of various extraneous offenses. Appellant was convicted of the following: (1) in February, 1987, appellant broke into a home, hit the female resident over the head with an iron, threatened her with a gun, threatened to kill her daughter, sexually assaulted her, and then burglarized the home; (2) on May 18, 1987, appellant, using a gun to threaten the employees, robbed a Golden Fried Chicken restaurant; (3) three days later on May 21, 1987, appellant, again using a gun, robbed a McDonald's restaurant; and (4) on January 20, 1988, while on probation for the previous offenses, appellant robbed a Domino's Pizza, using a toy gun to threaten an employee. In each of these instances, appellant threatened, essentially, to "blow [the victims'] brains out"[9] if they did not cooperate with him. On November 15, 1989, in an unadjudicated offense, appellant attempted to choke and sexually assault an acquaintance who was nine months pregnant at the time. Appellant threatened to kill her if she would not stop screaming. The woman managed to get away.

Despite appellant's assertions, the record shows he repeatedly threatened to kill others during his previous offenses and did harm his victims on more than one occasion. It was not necessary for the State to buttress its case on future dangerousness with psychiat-

ric testimony. *Narvaiz v. State,* 840 S.W.2d 415, 425 (Tex.Cr.App.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993); *Huffman v. State,* 746 S.W.2d 212, 224 (Tex.Cr.App.1988). Considering the record as a whole, we conclude there was sufficient evidence to support the jury's affirmative finding that there was a probability that appellant would be a continuing threat to society. Appellant's eighth point of error is overruled.

### Guilt/Innocence Phase

In his thirteenth point of error,[10] appellant complains that the trial court erred in failing to quash the indictment. Because appellant was charged with murder in the course of a burglary, he believes that fair notice dictates that the State should have been required to "allege burglary with intent to commit ... theft or a felony offense."

Appellant acknowledges that we have repeatedly held that an indictment need not allege the constituent elements of the aggravating feature which elevates murder to capital murder. *Beathard v. State,* 767 S.W.2d 423, 431 (Tex.Cr.App.1989) (need not allege the constituent elements of burglary); *Marquez v. State,* 725 S.W.2d 217, 236 (Tex.Cr. App.), *cert. denied,* 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987) (aggravated sexual assault); *Hammett v. State,* 578 S.W.2d 699, 708 (Tex.Cr.App.1979), *cert. denied,* 448 U.S. 725, 100 S.Ct. 2905, 65 L.Ed.2d 1086 (1980) (robbery). He raises no novel argument to persuade us to revisit these holdings. Point of error thirteen is overruled.

By way of his twelfth point of error, appellant contends that the trial court erred in denying his request for special venire, after having earlier granted same. Prosecution of this cause originated in Wichita County before Judge Driver. Prior to change of venue to Lubbock County, Judge Driver granted appellant's motion for a special

---

**9.** Specifically, in each offense, appellant stated, respectively: (1) "Do not look at me. If you look at me I'm going to kill you. I will blow your fucking brains out. If you look at me I will kill you"; (2) he would "blow [her] mind out"; (3) if the manager did not give him all the money, he would "blow [her] fucking brains out"; and (4)

"If you don't hurry up and open that safe, I'm going to pop a cap on you."

**10.** The remaining points of error will be addressed in the order in which they occurred at trial.

venire. Article 34.01. Appellant argues that Judge Driver should not have rescinded the original order without his permission.

Following the change of venue, trial commenced on March 25, 1991. Appellant objected when Judge Driver, who had been assigned to Lubbock County for the duration of the case, began to select venirepersons from the regular jury panel rather than a special venire. In overruling his objection, Judge Driver quoted Article 34.01 which leaves the empanelment of a special venire to the discretion of the trial court where more than 100 jurors have been summoned for regular service.

At trial, the State and appellant stipulated to the following: Wichita County does not have continuous jury weeks. It is general practice not to summon more than 100 jurors per week. Because of this practice, the method to obtain jurors for a capital case in Wichita County is by a special venire procedure. In Lubbock County, a capital case is generally heard by regular jurors summoned for service the week a capital case is set for trial. For the week of March 25th, 625 jurors were summoned for regular jury service in Lubbock County. Of those summoned, 264 appeared for service and 125 were assigned to the instant case.

The State also offered into evidence a letter dated March 13, 1991, from Judge William R. Shaver of Lubbock County to Judge Driver. The letter confirms that "it is agreeable with you [Judge Driver] for us to handle the Central Jury Pool in the usual method; . . . ." Appellant admitted to having reviewed the letter in the judge's chambers, although he never agreed or disagreed with the procedure. The trial court subsequently rescinded the previous order and overruled appellant's motion for special venire.

Because more than 100 jurors were called for service the week of appellant's trial, the decision to grant a special venire was within the discretion of the trial court. Article 34.01. Therefore, we will defer to the trial court's ruling. *Id.* Point of error twelve is overruled.

■ In his ninth point of error, appellant maintains that the trial court erred in sustaining the State's challenge for cause of prospective juror Brown because of her personal opinion regarding the death penalty. Specifically, he argues that her testimony indicates that she could set aside her disfavor of capital punishment and answer the special issues based on the evidence presented to her.

Brown is the quintessential "vacillating venireman." *Perillo v. State,* 758 S.W.2d 567, 576 n. 10 (Tex.Cr.App.1988), *cert. denied,* 492 U.S. 925, 109 S.Ct. 3263, 106 L.Ed.2d 608 (1989). During voir dire, after the State explained the function of the special issues during the punishment phase, *see* Article 37.-071, Brown stated that she could not answer the special issues "yes" knowing that the death penalty would be imposed. She further stated that she would answer "no" to avoid the result even if the evidence supporting a "yes" answer was overwhelming. The State then challenged Brown for cause.

On cross voir dire, Brown continued to reiterate her opposition to the death penalty. However, after appealing to her sense of duty as a juror, defense counsel was able to elicit the following:

BY [DEFENSE COUNSEL]:

Q That once you heard the evidence, that, you know, you felt very strongly that Question Number one should be answered "Yes," Question Two should be answered "Yes," and if it was appropriate and submitted Question Three answered the same. You could make that answer based upon the evidence?

A Yes. I would have to, you know—the evidence.

But on redirect Brown again insisted that no matter how much evidence the prosecutors could put on she would still automatically answer "no" to one or more of the special issues in order to give the defendant a second chance. Brown repeated her contradictory answers on subsequent recross and redirect. The trial court then granted the State's challenge for cause. Defense counsel objected to Brown's excusal.

In a capital case, the State is entitled to jurors who will impartially consider and decide the facts and conscientiously apply the

law as charged by the court. *Perillo*, 758 S.W.2d at 577; *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). We agree with appellant that venireman Brown at times stated that she could set aside her personal feelings and answer the special issues based upon the evidence. However, she just as firmly maintained that she would ignore the evidence no matter how great and answer "no" to at least one of the special issues in order to avoid the death penalty. When presented with a record such as this, we must afford great deference to the trial court's discretion in deciding whether a venireman should be excused on the basis of an inability to follow the law. Article 37.071; *Perillo*, 758 S.W.2d at 577. Although some of Brown's answers indicated that she could answer the special issues in accordance with the evidence, the record contains sufficient testimony to the contrary to hold that the trial court could reasonably have found that her testimony as a whole indicated that she would not have been able to perform her duties as a juror. *Perillo*, 758 S.W.2d at 577; *Wainwright v. Witt*, 469 U.S. 412, 420, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).[11] Since there is sufficient support in the record, we hold that the trial court did not err in granting the State's challenge for cause. Appellant's ninth point of error is overruled.

■ By way of point of error ten, appellant complains that the trial court erred in allowing the State to use a peremptory challenge against prospective juror Green because of her views on the death penalty. Appellant contends that it is a violation of his Sixth and Fourteenth Amendment rights under the United States Constitution for the State to utilize a peremptory strike to exclude a prospective juror who is not in favor of the death penalty.[12] We disagree.

■ Article 35.14 provides a vehicle with which to exclude potential jurors that an advocate believes are prejudiced against his cause. These peremptory challenges may be made for any reason so long as they are not exercised in a racially discriminatory manner. Article 35.261; *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Subject to the constraints of Article 35.261, we have held that a party need not assign a reason for exercising his peremptory strikes, even where the discernable purpose of the strike is to exclude a prospective juror who is not in favor of the death penalty. *Hernandez v. State*, 819 S.W.2d 806, 818 (Tex.Cr. App.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2944, 119 L.Ed.2d 568 (1992); *May v. State*, 738 S.W.2d 261, 267–68 (Tex.Cr.App.), *cert. denied*, 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 158 (1987). We overrule appellant's tenth point of error.

■ In his second point of error, appellant complains about the admission of six photographs depicting Bass as she appeared at the crime scene and her wounds as viewed at the autopsy. Appellant specifically complains the probative value of State's Exhibits 37, 38, 39, 68, 69, and 70 is greatly outweighed by their prejudicial effect.

At trial, appellant objected to the admission of State's exhibit 39 only on the basis of repetition. Since his trial objection does not comport with the issue raised on appeal, he has preserved nothing for our review. *Thomas v. State*, 723 S.W.2d 696, 700 (Tex. Cr.App.1986); *Johnson*, 803 S.W.2d at 293. Therefore, we will address appellant's argument only as to the remaining five exhibits. Appellant does not challenge the relevancy of these exhibits.

Appellant cites *Burdine v. State*, 719 S.W.2d 309, 316 (Tex.Cr.App.1986), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987), to argue that the photographs were submitted by the State purely to "inflame the passion of the jury." The Texas Rules of Criminal Evidence, however, have since modified *Burdine*. *See* Tex.R.Cr. Evid. 401, 402, and 403; *see also Long v. State*, 823 S.W.2d 259, 271 (Tex.Cr.App.1991),

---

11. Compare *Riley v. State*, 1993 WL 457205 (No. 69,738, Tex.Cr.App., delivered November 10, 1993) (Slip op. at 11–12) (venireman did not at any time state that he would not follow the law).

12. Appellant relies on *Brown v. Rice*, 693 F.Supp. 381 (W.D.N.C.1988), to support his ar-

gument. *Brown* has since been reversed in part by *Brown v. Dixon*, 891 F.2d 490 (4th Cir.1989), *cert. denied*, 495 U.S. 953, 110 S.Ct. 2220, 109 L.Ed.2d 545 (1990).

*cert. denied,* —— U.S. ——, 112 S.Ct. 3042, 120 L.Ed.2d 910 (1992). Our review is limited to determining whether the probative value of the photos is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence. Rule 403, supra; *Long,* 823 S.W.2d at 271, citing *Montgomery v. State,* 810 S.W.2d 372, 389 (Tex.Cr.App.1991) (Opinion on Rehearing).

A court may consider many factors in determining whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice. These factors include: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black and white, whether they are close-up, and whether the body depicted is clothed or naked. *Long,* 823 S.W.2d at 272. A court, however, should not be limited by this list. The availability of other means of proof and the circumstances unique to each individual case should also be considered. *Id.*

Appellant does not explain why he believes the photographs were inflammatory except to note that they "were especially gruesome in their detailed and vivid depiction of the murder scene and Ms. Bass's subsequent autopsy." State's exhibits 37 and 38 are 8″ × 10″ color photographs of decedent as she appeared at the scene of the crime. State's exhibit 37 is a close-up of decedent's shirt-wrapped head and depicts the injury to her eye. State's exhibit 38 shows the upper-portion of decedent, laying face down. The photo shows the impression wounds in her left shoulder and the direction the blood flowed from the initial head injuries. Although the photographs are gruesome and detailed, they are not enhanced in any way and portray no more than the injuries inflicted. *See Narvaiz,* 840 S.W.2d at 429. The trial court did not err in admitting these photographs.

State's exhibits 68, 69, and 70 are 8″ X 12″ color photographs of decedent at the coroner's office. State's exhibit 68 shows Bass nude and face down on the examining table. The body has been cleaned of the dried blood. The exhibit gives an overall view of the various injuries Bass received prior to the gunshot. State's exhibit 69 is a close-up of the head injuries. Bass' hair has been shaved from around the injuries in order to depict their shape. The exhibit was used during trial to show the semi-circular injury that was believed to have been caused by the lamp upon which appellant's fingerprint was found. State's exhibit 70 is the only photo of the stab wound to Bass' neck.

It is doubtful the State's case would have been rendered significantly less persuasive without the introduction of these photographs. Testimony was presented at trial regarding the cause of death and the effect of the blows to decedent. However, the photographs "are not, in our estimation, so horrifying or appalling that a juror of normal sensitivity would necessarily encounter difficulty rationally deciding the critical issues of this case after viewing them." *Fuller v. State,* 829 S.W.2d 191, 206 (Tex.Cr.App.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2418, 124 L.Ed.2d 640 (1993). Further, as regards the nudity in State's exhibit 68, the photo is not so vulgar or indecent as to draw attention away from the wounds that are the focus of the exhibit.

We are not persuaded that the danger of unfair prejudice substantially outweighed the probative value of the above photographs. Therefore, we hold that the trial court committed no error in admitting the exhibits. Point of error two is overruled.

In his third point of error, appellant argues that the trial court erred in not granting a mistrial after a nonresponsive answer was given by a witness. Appellant refers to a portion of witness Wilson's testimony where he stated he told Bass to keep a gun by her bed "because of what had been taking place in Wichita Falls." Appellant alleges that this statement was so inflammatory and prejudicial that the trial court's instruction to the jury to disregard was insufficient, and that his request for a mistrial should have been granted.

Error in admitting improper testimony may be corrected by a withdrawal and an instruction to disregard unless it appears the evidence is clearly calculated to inflame

the minds of the jury and is of such character as to suggest the impossibility of withdrawing the impression produced on their minds. *Waldo v. State,* 746 S.W.2d 750, 752 (Tex.Cr. App.1988). Here the arguable testimony occurred as follows:

BY [PROSECUTION]:

Q OK. I think I just have one last area of questioning, Mr. Wilson.

With regard to the revolver, the .32-caliber, did you make any suggestion to Mrs. Bass as to where to keep that weapon?

A Yes, I did sir.

Q And where did you suggest or recommend that she keep the weapon?

A Well, sir, I recommended to her to keep it on the stand near her bed there, because of what had been taking place in Wichita Falls.

When appellant objected, the trial court sustained the objection and instructed the jury to disregard the statement. Appellant then moved for mistrial, but his request was denied.

The State's line of questioning immediately prior to Wilson's statement was referring to the location of evidentiary items prior to the offense. Appellant argues that Wilson's statement about "what had been taking place in Wichita Falls" would naturally lead the jury to believe that other criminal activity similar to facts in this case had been happening in the area and that appellant was responsible for those episodes too. However, Wilson's statement was general and did not refer to appellant in any way. Viewing the nonresponsive answer in context, we find that neither the question nor Wilson's response was "clearly calculated to inflame the minds of the jury." *Waldo,* 746 S.W.2d at 752. We hold that the trial court's instruction to disregard cured any error. The point of error is overruled.

■ In his first point of error, appellant asserts that the trial court erred in admitting the fruits of a search carried out pursuant to an invalid search warrant. Specifically, he argues that because the attached appendices to the search warrant affidavit were not in-

corporated by reference into the body of the affidavit, the search warrant was not supported by probable cause. Appellant concedes that if the appendices were incorporated, the search warrant would probably be valid.

The search warrant incorporates the affidavit by reference. Attached to the sworn-to and signed affidavit are appendices A and B. Each appendix is entitled "Affidavit for evidence search warrant." Neither appendix is itself signed or individually sworn to. Nor does the affidavit expressly incorporate the appendices by reference.

Generally, incorporating the appendices to an affidavit by reference would be preferred. It does not invariably follow that absent such an incorporation the affidavit must fail. *Cf. U.S. v. Beaumont,* 972 F.2d 553, 561 (5th Cir.1992), *cert. denied, Beaumont v. U.S.,* — U.S. ——, 113 S.Ct. 1953, 123 L.Ed.2d 657 (1993) (a warrant does not necessarily fail absent incorporation by reference of the affidavit); *see also Commonwealth v. Truax,* 397 Mass. 174, 490 N.E.2d 425, 431 (1986) (affidavit valid even though pages attached to warrant were not signed or sworn to). The Supreme Court has cautioned that "affidavits for search warrants ... must be tested and interpreted by magistrates and courts in a common sense and realistic fashion." *U.S. v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965).

There was testimony elicited at a motion to suppress hearing conducted during trial that the issuing magistrate essentially considered the attached appendices as part and parcel of the warrant affidavit. The appendices are physically attached to the affidavit, and the matter contained therein is an obvious continuation of that paragraph of the affidavit setting forth the basis for probable cause. The magistrate even suggested a handful of changes to appendix A before he signed the warrant. These changes were made by hand and initialed by both the magistrate and the affiant.[13] Under these unusual circumstances it is apparent that the magistrate considered the affiant's oath to extend not

---

13. At the suppression hearing appellant argued the magistrate thus abandoned his detached and neutral status. He does not reiterate this argument, however, on appeal.

only to matters contained on the face of the affidavit page, but also to the information contained in the attached appendices. The trial court could reasonably have concluded that the appendices were implicitly incorporated within the affidavit. Appellant's first point of error is overruled.

In his sixth and seventh points of error, appellant contends that the trial court erred by denying his requested jury instruction on "reasonable doubt" in both the guilt/innocence and punishment phases of trial. He argues that because he requested an instruction similar to the one required in *Geesa v. State,* supra, the holding in that case should be given retroactive application to his case. During both phases of trial, appellant requested the following definition:

> A reasonable doubt is based upon reason and common sense, and not the mere possibility of guilt. A reasonable doubt is the kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt, therefore, must be proof of such convincing character that a reasonable person would not hesitate to act and rely on it.

Appellant now argues that because his definition essentially tracks the one required by *Geesa,* 820 S.W.2d at 162, and because he preserved error by requesting the definition, that *Geesa* should be applied retroactively to his case.

We find appellant's argument unpersuasive. At the time appellant was tried, it was not a requirement that the trial court define "reasonable doubt." *Goss v. State,* 826 S.W.2d 162, 169 (Tex.Cr.App.1992), *cert. denied,* ―― U.S. ――, 113 S.Ct. 3035, 125 L.Ed.2d 722 (1993); *McGinty v. State,* 723 S.W.2d 719, 720–21 (Tex.Cr.App.1986). Although we have subsequently held that a definitional instruction of the term is required, we declared in *Geesa* that this holding would be applied prospectively only.

*Geesa,* supra, at 165; *Goss,* supra, at 169. Appellant does not argue we erred to limit application of *Geesa* to cases tried after it was handed down, and we do not address that question here.[14] He contends only that because he preserved error, he should be excepted from the prospective-only rule. But to hold that a change in the law will have only a prospective application is essentially to hold that there was no error previously to preserve. Points of error six and seven are overruled.

## Punishment Phase

In appellant's fifteenth point of error, he contends that the trial court erred in permitting three punishment-phase witnesses to testify because their names were not on the State's witness lists. On appeal, he further objects that the testimony resulted in surprise.

If a witness' name is not furnished a defendant before trial despite a court order, any error in allowing that witness to testify over a claim of surprise is "made harmless" by defendant's failure to object or move for a continuance. *Youens v. State,* 742 S.W.2d 855, 860 (Tex.App.—Beaumont 1987, pet. ref'd), citing *Hubbard v. State,* 496 S.W.2d 924, 926 (Tex.Cr.App.1973). In the instant case, appellant objected[15] but failed to move for a continuance in order to interview the witnesses or determine the matters about which they were to testify. Having failed to do so, he "cannot now be heard to complain." *Hubbard v. State,* supra. We overrule appellant's fifteenth point of error.

In point of error fourteen, appellant complains that the trial court erred in allowing extraneous documents to be admitted as part of appellant's pen packet. During the punishment phase of trial, appellant's pen packet was admitted into evidence. Included in the packet was a motion to revoke proba-

---

14. This Court has seen a number of arguments in recent months that our prospective-only holding in *Geesa* was in error, under the rationale of *Harper v. Virginia Department of Taxation,* 509 U.S. ――, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993). Appellant makes no such argument here, however, and in fact cites only *Geesa* itself in support of this point of error.

15. Appellant did not object on the basis of surprise during trial. Therefore, nothing was preserved for review on that point. *See Thomas,* 723 S.W.2d at 700.

tion, an order issuing an arrest warrant, and an arrest warrant for cause numbers 24,599–C and 24,371–C. Appellant contends that these documents contain "extraneous hearsay material" and the "jury could interpret these documents to be a comment on the weight of the evidence by the court in the jury's mind." We disagree.

 We address first that part of appellant's multifarious argument that the motion to revoke, the order, and the warrant were "extraneous." The trial court may admit any evidence it deems relevant to sentencing at the punishment phase of a capital murder trial. *Felder v. State*, 848 S.W.2d 85, 98 (Tex.Cr.App.1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 95, 126 L.Ed.2d 62 (1993). Appellant argues that the above documents were not necessary or required in order to prove the prior convictions because the indictments, judgments, and sentences were all admissible for that purpose. Appellant overlooks, however, that the trial court may have deemed them relevant to one of the special issues. That appellant committed another crime while already on probation for other offenses has a bearing on the question of whether he would pose a future danger to society. Article 37.071(b)(2). It was within the trial court's discretion to determine if the documents had relevance to either of the special issues. Absent a clear abuse of discretion, the trial court's ruling will not be disturbed. *Id.*

 As for appellant's contention that the notion to revoke, the order issuing the arrest warrant, and the warrant itself were all hearsay, we note that appellant did not object specifically that these documents were hearsay. Instead he made what he himself characterized at trial as a "general" objection

that the entire pen packet was hearsay. In *Jones v. State*, 843 S.W.2d 487, at 492 (Tex. Cr.App.1992), we opined:

> The trial court need never sort through challenged evidence in order to segregate the admissible from the excludable, nor is the trial court required to admit only the former part or exclude only the latter part. If evidence is offered and challenged which contains some of each, the trial court may safely admit it all or exclude it all, and the losing party, no matter who he is, will be made to suffer on appeal the consequences of his insufficiently specific offer or objection.

Appellant does not now contend that the entire pen packet was hearsay. The trial court was not required, in the face of a global hearsay objection, to cull through the pen packet and exclude whatever particular matters he may find there that meet that description. See Tex.R.Cr.Evid. 103(a)(1). Appellant's fourteenth point of error is overruled.

 Finally, in his eleventh point of error appellant contends the trial court erred in its instruction during the punishment phase regarding mitigating evidence,[16] commonly referred to as the *Penry* instruction. *See Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Specifically, he complains that the trial court did not place the burden of proof on the State to negate the mitigating circumstances.

 In instances where mitigating evidence is presented, all that is constitutionally required is a vehicle by which the jury is able to consider and give effect to the mitigating evidence relevant to a defendant's background, character, or the circumstances of the crime. *Penry*, 492 U.S. at 329, 109 S.Ct. at 2952; *Johnson v. Texas*, 509 U.S. ——,

---

16. The jury was instructed, in part:

> [W]hen you deliberate on the questions posed in the special issues, you are to consider mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the state or the defendant.
>
> ❖ * ❖ ❖ * *
>
> If you find that there are mitigating circumstances in this case, you must decide how much weight they deserve, if any, and thereafter, give effect answering the issue under con-

> sideration. If you determine, when giving effect to the mitigating evidence, if any, that the appropriate punishment for the defendant, based on his background, character or the circumstances of this case, should be a life sentence rather than a death sentence, you are instructed to answer "no" to at least one of the special issues.

Whether this is an adequate *Penry* instruction is not before us. See, however, *Rios v. State*, 846 S.W.2d 310, 316 (Tex.Cr.App.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1946, 123 L.Ed.2d 651 (1993).

——, 113 S.Ct. 2658, 2667, 125 L.Ed.2d 290 (1993). In Texas, this vehicle commonly takes the form of a jury nullification instruction, as in the instant case, or a fourth special issue. *See Fuller*, 829 S.W.2d at 209 (jury nullification charge), *State v. McPherson*, 851 S.W.2d 846, 847–50 (Tex.Cr.App.1992) (fourth special issue).

Neither this Court nor the Texas legislature has ever assigned a burden of proof on the issue of mitigating evidence. *See* Article 37.071.[17] The Eighth and Fourteenth Amendments do not require that a burden be placed on the State. In a plurality opinion, the United States Supreme Court in *Walton v. Arizona* affirmatively declined to "adopt as a constitutional imperative a rule that would require the court to consider the mitigating circumstances claimed by a defendant unless the State negated them by a preponderance of the evidence." 497 U.S. 639, at 650, 110 S.Ct. 3047, at 3055, 111 L.Ed.2d 511, at 526 (1990) (plurality opinion). The plurality in *Walton* further held that it is not unconstitutional to place a burden on the defendant to establish sufficient mitigating circumstances by a preponderance of the evidence. *Id.* U.S. at 649–651, S.Ct. at 3055–56, L.Ed.2d at 525–27. Because neither legislation nor constitution places a burden of proof upon the State to negate the existence of mitigating evidence, we refuse to fault the trial court for failing to give the jury such an instruction. Therefore, appellant's eleventh point of error is overruled.

Finding no reversible error, we affirm the judgment of the trial court.

McCORMICK, P.J., not participating.

---

**17.** Currently, Article 37.071 mandates that a jury that finds beyond a reasonable doubt, as required by Subsection (c), that the special issues under Subsection (b) should be answered affirmatively must go on pursuant to Subsection (e) to decide whether mitigating circumstances nevertheless warrant a life sentence. However, neither Subsection (c) nor Subsection (e) itself expressly assigns a particular burden of proof on the issue of mitigation. It might be argued, although we certainly have no occasion here to hold, that Subsection (c) implicitly assigns the burden of proof to the beneficiary of a finding of "sufficient mitigating ... circumstances to warrant that a sentence of life ... be imposed." Cf. *Arnold v. State*, 786 S.W.2d 295, at 298 (Tex.Cr.App.1990) (State has burden of proof to establish harmless error under Tex.R.App.P. 81(b)(2), as beneficiary of the error). That, of course, would be the defendant. But at the time of appellant's trial there was no statutory authority for a *Penry* instruction of any kind, much less a legislative assignment of burden of proof, either express or implied.