

# NUMBER 13-22-00471-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

ANDREW SANCHEZ GUERRA,                                                     Appellant,

v.

THE STATE OF TEXAS,                                                        Appellee.

## On appeal from the 437th District Court
## of Bexar County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Silva and Peña
Memorandum Opinion by Chief Justice Contreras**

Appellant Andrew Sanchez Guerra challenges his convictions for two counts of

sexual assault of a child and two counts of indecency with a child against his

stepdaughter, J.W.[1] *See* TEX. PENAL CODE ANN. §§ 21.11, 22.011.[2] The jury assessed his sentence at ten years' imprisonment for the sexual assault counts and five years' imprisonment for the indecency counts, and it recommended that the sentences be suspended and that Guerra be placed on community supervision for ten years. The trial court sentenced him in accordance with the jury's findings, suspended the sentence, and placed him on community supervision for ten years pursuant to its recommendation. Guerra argues by four issues, which we construe as one, that the trial court erred when it excluded certain text messages from evidence and limited testimony regarding the text messages. We affirm.

## I.    BACKGROUND[3]

Guerra married April Guerra in June 2008. He became the father figure to April's two daughters from a previous marriage, J.W. and Jo.W. The couple had a third child, A.G., in 2009. April's daughters considered Guerra their father and all three daughters were close with him.

April filed for divorce in September of 2017. She testified that she filed for divorce because Guerra's behavior changed sometime around March of 2016. She suspected he was cheating on her because she saw him use a credit card that she did not recognize.

---

[1] To protect the identity of the complainant, we refer to her by her initials. *See* TEX. CONST. art. I, § 30(a)(1) (providing that a crime victim has "the right to be treated . . . with respect for the victim's dignity and privacy throughout the criminal justice process").

[2] One count of sexual assault of a child was charged as a second-degree felony and the other was charged as a first-degree felony under § 22.011(f)(1)(A). *See* TEX. PENAL CODE ANN. § 22.011(f)(1)(A) (providing that sexual assault of a child is generally a second-degree felony, but it is a first-degree felony if the victim was "a person whom the actor was prohibited from marrying or purporting to marry or with whom the actor was prohibited from living under the appearance of being married under [§] 25.01"); *see also id.* § 25.01(a)(1)(B) (providing that a person commits the offense of bigamy if "he is legally married and he . . . lives with a person other than his spouse in this state under the appearance of being married").

[3] This appeal was transferred to this Court from the Fourth Court of Appeals by order of the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001.

They continued living together for three weeks before Guerra moved out of the family home and moved in with his parents. He lived with his parents for about three or four months before moving into an apartment. After the divorce, all three daughters saw Guerra regularly and spent every other weekend at his apartment.

J.W. was nineteen years old at the time of trial. She testified that the abuse first occurred when Guerra gave her massages to relieve soreness in her back. She said it was not uncommon for her to receive massages from Guerra because she was often sore from her after-school extracurricular activities. But beginning in May 2017, he began touching her under her bra and underwear. J.W. testified that he would also place her hand on the inside or outside of his pants to feel his erect penis.

She described the first incident of penetration happening at Guerra's parents' house on November 18, 2017. J.W., then fifteen years old, and her younger sisters were with Guerra at his parents' house for a family party. J.W. shared a bed with Guerra that night and her two sisters slept elsewhere in the house. J.W. testified that Guerra got into bed drunk, and he told her "he wanted to be inside [her]." He then pulled her on top of him, pulled her pajama pants and underwear down, and penetrated her vagina with his penis.

J.W. testified that the abuse involving penetration continued from November 2017 until her outcry in January 2019. She said that Guerra penetrated her vagina on many occasions, and "it was hard to keep track of each and every individual date." These incidents would typically happen when she spent the night at his apartment over the weekends with her sisters. A.G. slept in the apartment's second bedroom and Jo.W. slept on the couch in the living room. J.W. regularly slept in Guerra's room.

3

On Sunday, January 20, 2019, J.W. returned home after a weekend at Guerra's apartment and told April about the sexual abuse. April took her daughters to stay with her aunt and called the police. Guerra was arrested shortly after.

About a month before J.W.'s outcry, on December 6, 2018, April finalized the couple's divorce. April testified that, though she and Guerra had stopped attempting to reconcile by this point, Guerra asked her to reconsider the divorce the day before the divorce was finalized. About a week later, Guerra asked to go on a date with her for his birthday. April testified that, though she went through with the divorce, these events led her to believe he "was actually serious this time" about getting back together. The day after Guerra's birthday, however, April received a Facebook message from Hector Lopez alleging that his wife, Mariah Lopez (Mariah), and Guerra were romantically involved. April testified that "it didn't really matter to [her] what he was doing," and that she "did not really care" he was dating another woman. But when April asked her daughters whether they knew Mariah, she was upset to find out that not only had they met Mariah multiple times, but Guerra had instructed them to not tell April that he was dating Mariah:

[The State]:   How did you feel about the revelations [that Guerra was dating Mariah] while he was talking to you, and that Mariah was somebody that had been in the children's life without your knowledge?

[April]:   I was upset. Like this was the first time that I realized I couldn't trust him. This was the first time I realized we weren't on the same page. And it didn't matter what he was doing and it, frankly, wasn't any of my business, but I do believe that I should have knowledge of who my kids are around. And that was the biggest thing.

[The State]:   And how would you say you reacted to that emotionally? How did it make you feel?

4

[April]: I was upset. And in my text[s] I did say some inappropriate and immature things.

[The State]: All right. So you said—

[April]: I was trying to get a reaction out of him.

[The State]: You were trying to get a reaction from who[m]?

[April]: From [Guerra] to respond, because he was stonewalling me.

[The State]: And you said you sent messages that you're not proud of?

[April]: Yes.

[The State]: What do you mean by that?

[April]: Because they were immature.

[The State]: Was that—at that point were you still willing to consider reconciliation with [Guerra]?

[April]: No. Absolutely not. Not after that.

On cross examination, the defense asked April about the texts she sent Guerra after she found out he was dating Mariah:

[Defense]: And when you found out [about Mariah], you were furious, were you not?

[April]: I was upset, yes.

[Defense]: All right. And you sent 269 texts to [Guerra] during that time, correct?

[April]: I did send quite a bit. I don't know how many.

[Defense]: And the texts were insulting of [Guerra], correct?

[April]: I don't recall the content of the text[s.] I do remember that they were immature.

The defense then attempted to authenticate and offer into evidence fifty-six pages of text messages allegedly between April and Guerra spanning from December 18, 2018, to

5

January 3, 2019. When the defense asked April if she sent the texts, she stated: "I don't recall sending those texts. I recall being upset. I don't remember what I sent" and "I'm not denying anything. I'm saying I don't remember."

The trial court then excused the jury to determine the admissibility of the text messages. The defense argued the text messages were relevant to show "the environment under which [J.W.] found herself . . . to possibly manufacture [the sexual assault] claims" and were relevant to illustrate April's motive and bias to testify against Guerra. The State responded that the texts were inadmissible because they were not properly authenticated, they were not relevant, and they were hearsay. The trial court denied the admission of the text messages, ruling that they were not relevant and stating that they could only be admitted if they indicated that April "had manipulated [J.W.], or gotten [J.W.] to lie about the sexual assault, or that [April and Guerra] weren't married at the time and [April was] lying about that."

The defense next argued that the texts could come in as impeachment evidence, arguing that April had misrepresented the relationship between her and Guerra on direct examination. *See* TEX. R. EVID. 801(e)(1)(A) (providing that a statement is not hearsay if it "is inconsistent with the declarant's testimony" at trial and was given under penalty of perjury). The defense explained it "should be allowed to ask if [April] recalls [composing] each of the text[s]," and then if she denied sending any of the messages, the defense could impeach her by reading the texts back to her. The trial court denied the defense's request, reiterating that the texts were not relevant.

The jury found Guerra guilty of one count of bigamy-enhanced sexual assault of a child, one count of sexual assault of a child, and two counts of indecency with a child. *See* TEX. PENAL CODE ANN. §§ 21.11, 22.011. This appeal followed.

## II.    DISCUSSION

In his first issue, Guerra argues that the trial court abused its discretion when it excluded the text messages from evidence. In his second issue, Guerra contends the trial court abused its discretion when it limited its cross-examination of April about the contents of the text messages. In his third issue, he argues the trial court violated his right to confront and cross-examine April. Lastly, he argues the trial court violated his right to present a defense.

We address these issues as one: whether the trial court abused its discretion in denying admission of the text messages into evidence and limiting testimony regarding the text messages. *See Mata v. State*, 517 S.W.3d 257, 264 (Tex. App.—Corpus Christi–Edinburg 2017, pet. ref'd) (citing *Love v. State*, 861 S.W.2d 899, 903 (Tex. Crim. App. 1993)) (interpreting the appellant's complaint about the constitutional right to cross-examination as a complaint of alleged error in the exclusion of evidence).

### A.    Standard of Review and Applicable Law

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). Under this standard, we may not reverse the trial court's judgment unless it "falls outside the zone of reasonable disagreement." *Id.* at 83 (citations omitted). "We must uphold a trial court's evidentiary ruling if it is correct under any theory of law applicable to the case." *Hernandez*

7

*v. State*, 585 S.W.3d 537, 551 (Tex. App.—San Antonio 2019, pet. ref'd) (citing *Henley*, 493 S.W.3d at 93).

## B.      Harm Analysis

We assume without deciding that the trial court erred by excluding the text messages and limiting additional testimony by April about the contents of the text messages. Accordingly, we proceed to a harm analysis.

### 1.      Constitutional or Non-Constitutional Error

The standard for reversible error in criminal cases depends on whether the error is constitutional or non-constitutional. *See* TEX. R. APP. P. 44.2(a), (b); *Mercier v. State*, 322 S.W.3d 258, 261 (Tex. Crim. App. 2010). A constitutional error must be reversed unless the court of appeals "determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a). "With respect to the erroneous admission or exclusion of evidence, constitutional error is presented only if the correct ruling was constitutionally required; a misapplication of the rules of evidence is not constitutional error." *Fox v. State*, 115 S.W.3d 550, 563 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) (citing *Tate v. State*, 988 S.W.2d 887, 890 (Tex. App.—Austin 1999, pet. ref'd)). Non-constitutional errors will result in reversal only if the defendant's "substantial rights" were affected. TEX. R. APP. P. 44.2(b).

Generally, the erroneous exclusion of evidence constitutes non-constitutional error and is reviewed under Rule 44.2(b). *Walters v. State*, 247 S.W.3d 204, 219 (Tex. Crim. App. 2007). The exception is when erroneously excluded evidence "forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense." *Id.* (citing *Potier v. State*, 68 S.W.3d 657, 665 (Tex. Crim. App. 2002)). In such

8

a situation, the defendant's Sixth Amendment right to confront witnesses may be violated. *See Johnson v. State*, 433 S.W.3d 546, 551 (Tex. Crim. App. 2014) ("Rather, the main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination because that is the principal means by which the believability of a witness and the truth of his testimony are tested." (cleaned up)). But "a 'less than optimal' opportunity for cross-examination does not, of itself, violate the Sixth Amendment." *Id.* at 557. "Only when the trial court's limitation on cross-examination sweeps so broadly as to render the examination wholly ineffective can it be said that the trial court commits an error of constitutional dimension." *Id.*

## 2. No Harm

Guerra argues that the text messages and testimony related to the contents of the messages were relevant (1) to show April's credibility, motive, and bias to testify against Guerra; (2) to show "the hostile relationship between [Guerra] and April at the time the allegations were made[, supporting] the defense's theory of how these false allegations could come about"; and (3) to "put other testimony that April brought before the jury in proper context." He similarly argues that limiting the cross-examination of April prohibited "him from cross-examining a witness concerning possible motives, bias, and prejudice to such an extent that he could not present a vital defensive theory." *See Hammer v. State*, 296 S.W.3d 555, 562–63 (Tex. Crim. App. 2009).

April contended at trial that she was not jealous that Guerra was dating another woman, but rather she was upset that Guerra had instructed their daughters to keep his relationship with Mariah a secret. Though she could not remember the exact text messages, she admitted that she was "upset" after finding out Guerra was dating Mariah,

9

and that she sent "immature" and "inappropriate" text messages. Most of the text messages illustrated that frustration and anger, including: "How does it feel to be a cheater?!?!"; "You're trash and so is she"; "I[']m seeking a restraining order for the girls against [Mariah]"; "HELLO MOTHER FUCKER!!!!"; "How could you let some trash have my daughter call her mommy"; "I have a right to know WHO is around my kids; MY kids. [J.W.] and [Jo.W.] aren't yours"; and "The fact that you continuously lie and try to manipulate me shows you're just as mental as [Mariah]. I don't think you're fit to be a father."

Some of the text messages contained vaguely threatening language, such as the following: "Guess I'll pay that place a visit" (referring to Mariah's workplace); "I wonder if [your employer] knows about all this? . . . I'm gonna contact [your employer]"; "You are a worse father than the girl's biological father; a horrible father. I have to now try and undo all this trauma you caused[.] I'm going to take you back to court"; and "Why didn't I get child support from you on 12/15? . . . Send it now[.] I'm not 'working with you' anymore[.] And if you REALLY want to [get a] court order we will and you won't like it." However, none of the text messages contained an explicit threat to have Guerra incarcerated, ruin his life, or threaten to have one of their daughters lie about sexual abuse. *See Smith v. State*, 340 S.W.3d 41, 53 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (holding trial court did not abuse its discretion in excluding "hateful" text and voice mail messages from victim's mother to appellant).

Guerra's trial counsel wanted to admit the text messages to illustrate April's bias towards Guerra and ultimately to show that J.W. was influenced by her mother to lie about the abuse. However, April admitted multiple times, both on direct and cross-examination,

10

that she sent "immature" and "inappropriate" text messages to Guerra after she found out he was dating Mariah because she was "upset." She admitted she sent the messages to get a reaction out of him and she was not proud of the text messages she sent. Furthermore, though Guerra states multiple times in his brief that he was "not even allow[ed] . . . to question April about the contents of the text messages," the defense did question April about the contents of the text messages, including:

> [Defense]: [Do] you recall telling [Guerra] . . . that you were going to follow the [divorce decree, allowing the girls to visit], the first, third and fifth weekends strictly?
>
> [April]: Previously, we had discussed that the divorce decree was something that we would fall back on, if we weren't on the same page. That's why I allowed him to take [our daughters] whenever they wanted, I was very flexible with it. But, yes, when I realized we weren't on the same page, due to discovering the whole Mariah thing, I said that we were going to stick to the divorce decree.
>
> . . . .
>
> [Defense]: All right. And do you recall sending a text stating that [Jo.W.] and [J.W.] are not his kids?
>
> [April]: I don't recall sending a text like that. He already knew that.
>
> [Defense]: Did you tell [Guerra] in a text that he was going to only see [A.G.], his biological child, because that's what the decree said?
>
> [April]: No.
>
> . . . .
>
> [Defense]: Would you agree that in your text messages to [Guerra], you told him that you did not want Mariah around your children?
>
> [April]: I do not recall that.

11

[Defense]:     Do you deny saying that?

[April]:        I do not recall it.

The jury also heard testimony from J.W. and Jo.W. about how they perceived April's anger. J.W. was extensively questioned during cross-examination about a potential motive to lie for her mother:

[Defense]:     But [April's] reaction [to the news Guerra was dating Mariah] was much stronger than what you testified to. She was livid, wasn't she?

[J.W.]:         At moments, especially at first. She was upset because we had not told her about what had happened.

[Defense]:     Well, let me ask you again. She was livid. She was besides herself, wasn't she?

[J.W.]:         I guess you could say that.

[Defense]:     Well, I want to know if you agree with me or not.

[J.W.]:         From what I understand, I do agree with you.

                        . . . .

[Defense]:     Okay. So as a result of that, [J.W.], she disallowed visitations with your stepdad?

[J.W.]:         There were certain times where they did argue and she did not want us going over because of the arguments that had taken place, but that was not something in which she said, you are never going over there ever again.

[Defense]:     Well, that wasn't my question. My question was that as a result of this leak of information about Mariah, and somebody calling her mom, your mom retaliated by not letting you all go to him again. That's my question.

[J.W.]:         I would say that that happened maybe a weekend or so, but that was not a consistent thing.

[Defense]:    But it happened?

[J.W.]:       Correct.

              . . . .

[Defense]:    Okay. Do you remember that time as being one where your mom was particularly upset with everybody about this Mariah business?

[J.W.]:       I do remember that happening. . . . My mom did say certain things, but she did not follow up on a lot of the things she had said or stated that she would do. So I would say that she was upset, but I don't know if I would necessarily say that she blew up, especially to the extent in which you're referring.

[Defense]:    You were concerned that your mom would leave you if this continued, you wanted to show her your loyalty?

[J.W.]:       Can you elaborate on that, please?

[Defense]:    You felt that your mom would probably reject you to some degree or another, if you didn't turn on Mariah and go away.

[J.W.]:       No, I would not say that. . . . I would say that my mom was uncomfortable with the fact that we withheld the information from her, but I would not say that my mom instructed us or even hinted at us needing to be completely against Mariah.

[Defense]:    But you wanted to avoid her wrath, didn't you?

[J.W.]:       My mother's wrath?

[Defense]:    Yes.

[J.W.]:       I—I wanted my mom to be happy. I hated seeing her hurt, but I was not going to take that to the extent in which I would turn on somebody or take it even further.

[Defense]:    Would you say that you wouldn't make up these accusations to gain your mom's trust, dump on your stepdad, you're saying you wouldn't do that?

[J.W.]:       I would not make [up] those accusations, because it's a very serious thing that has serious consequences. . . . And because of all this, I have missed out on a lot. I have had to

13

> go through a lot. So it's not something that I would just be like, let me do this because I'm mad at him. There's—there's so m[uch] I lost from this experience that I would not just make up that accusation to go through all of this.

The harm resulting from the error, if any, did not satisfy the standards set forth under either Rule 44.2(a) or 44.2(b). *See Valle v. State*, 109 S.W.3d 500, 507 (Tex. Crim. App. 2003) ("The fact that appellant was not able to present his case in the form he desired does not amount to constitutional error when he was not prevented from presenting the substance of his defense to the jury."); *Gotcher v. State*, 435 S.W.3d 367, 375 (Tex. App.—Texarkana 2014, no pet.). Guerra was still able to present his defense because there was substantial testimony about a potential motive for April and J.W. to lie. *Gotcher*, 435 S.W.3d at 375 ("Here, the excluded testimony was certainly of a graphic and important nature to Gotcher's defense, but he was still able to present his defense without it. We, therefore, evaluate this error as non[-]constitutional and evaluate harm based on whether it affected Gotcher's substantial rights."); *Broussard v. State*, 434 S.W.3d 828, 835 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) ("The exclusion of evidence that furthers appellant's defensive theory only incrementally is non-constitutional error."). Thus, we conclude that excluding the text messages was harmless because it was cumulative of other testimony admitted at trial. *See* TEX. R. APP. P. 44.2(b); *Smith*, 340 S.W.3d at 53–54 (finding that the complainant's mother's hateful text and voicemail messages to appellant were overly cumulative and holding the trial court did not abuse its discretion in excluding the messages); *Franks v. State*, 90 S.W.3d 771, 805–06 (Tex. App.—Fort Worth 2002, no pet.) (holding that because complained-of testimony was generally cumulative of other evidence introduced in case, no harm attached).

Similarly, limiting cross-examination about the text messages was harmless because evidence of a possible bias and motive for April and J.W. to lie was presented to the jury through their testimony. The admission of the text messages and additional testimony would, at most, only have marginally increased the intended effect already expressed by other evidence that the jury was permitted to hear. *See Smith*, 340 S.W.3d at 53–54. Furthermore, Guerra's trial counsel was not prevented from cross-examining April about his defensive theory, i.e., questioning her about whether she coached J.W. to lie about the sexual abuse.

While the text messages may have shown some vague threats, none of the text messages indicated that April "had manipulated [J.W.], or gotten [J.W.] to lie about the sexual assault." *See Smith*, 340 S.W.3d at 53. Ultimately, the jury is the "exclusive judge of the credibility of witnesses and of the weight to be given their testimony." *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000) (quoting *Barnes v. State*, 876 S.W.2d 316, 321 (Tex. Crim. App. 1994)). In this regard, the jury was able to effectively weigh the credibility and the testimony of the witnesses at trial.

In sum, we cannot find that Guerra's substantial rights were affected when the text messages were excluded from evidence and testimony about the text messages was limited, and we accordingly conclude that any alleged complained-of error, if true, was harmless. *See* TEX. R. APP. P. 44.2(b). We further determine beyond a reasonable doubt that the exclusion of the text messages and related testimony did not contribute to Guerra's conviction or punishment. *See id.* 44.2(a). We overrule Guerra's issues.

### III. CONCLUSION

The trial court's judgment is affirmed.

DORI CONTRERAS
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
30th day of November, 2023.