In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-02-00031-CR


______________________________




GREGORY CHAVEZ SALAZAR, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the Criminal District Court No. 4


Dallas County, Texas


Trial Court No. F01-32380-WK




 




Before Morriss, C.J., Grant and Ross, JJ.


Opinion by Justice Ross



O P I N I O N



 Gregory Chavez Salazar was convicted in a single trial of the offenses of aggravated
sexual assault and three charges of indecency with a child. All four charges were tried
together. The court sentenced Salazar to twenty-five years' imprisonment for the
aggravated sexual assault offense and twenty years' imprisonment each for the three
charges of indecency with a child, with fines of $1,000.00 for each offense. The trial court
ordered the punishments to run concurrently. This appeal concerns one of the convictions
for indecency with a child. The causes have been appealed separately and have been
briefed identically. 

 Since the briefs and arguments raised therein are identical in all the appeals, for the
reasons stated in Salazar v. State of Texas, No. 06-02-00029-CR, we likewise resolve the
issues in this appeal in favor of the State.

 We affirm the judgment.


 Donald R. Ross

 Justice


Date Submitted: September 3, 2002

Date Decided: September 4, 2002


Do Not Publish

 



ed="false" Priority="9" QFormat="true" Name="heading 3"/>
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 












 
 
 
 
 
 
 




 

 

 

 

 

 

 

 

 

                                                         In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-09-00165-CR

                                                ______________________________

 

 

                               ROY RAYMOND ROUSE, JR.,
Appellant

 

                                                                V.

 

                                     THE STATE OF TEXAS, Appellee

 

 

                                                                                                  


 

 

                                       On Appeal from the 276th
Judicial District Court

                                                            Marion County, Texas

                                                           Trial
Court No. F13955

 

                                                        
                                          

 

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                              Memorandum Opinion by Justice Carter








                                                      MEMORANDUM OPINION

 

            On August 10, 2008, Roy Raymond
Rouse, Jr., shot his long-time neighbor and acquaintance, Rocky Hill, with a
.22 caliber rifle.  The shot struck Hill
in the left side of the face, shattering twenty-two teeth.  Hill survived the shooting, but required
extensive medical care and numerous surgeries. 
Rouse was indicted on a charge of aggravated assault with a deadly
weapon. After trial by jury, in which Rouse contended the shooting was
accidental, Rouse was found guilty of aggravated assault with a deadly weapon[1]
and sentenced to four years imprisonment in the Institutional Division of the
Texas Department of Criminal Justice. 

            Rouses only
issue on appeal is that the evidence was factually insufficient for
conviction.  Because the evidence to
support conviction is factually sufficient, the judgment of conviction is
affirmed. 

 

I.          Background

 

            Hill
lived only a block from Rouse, and the two had known each other for over ten
years. Hill and Rouses friendship was sporadic, and they usually did not get
along well.  On the day of the shooting,
Hill was at home with his live-in girlfriend, Jennifer Rouse,[2]
when a friend invited Jennifer and Hill to join him at the Kellyville Pub in
Jefferson.  As Jennifer and Hill were
leaving for the pub at approximately 4:30 p.m., they saw Rouse in his driveway
and invited him to join them.  Hill,
Jennifer, and Rouse went to the pub together in Hills truck.  Once at the pub, the group drank beer and
played pool.[3]  Hill and Rouse drank six or seven beers each while
at the pub, and Jennifer consumed three beers. 


            Around 10:00
p.m., Jennifer decided to leave.  As she
began to drive away in Hills truck, Hill jumped in the back of the truck and
left with her,[4] leaving Rouse
at the pub.  The two returned to Hills
residence.  Shortly after arriving home,
Hill decided to go to Rouses house to check on Ashton Moore, Jennifers
sixteen-year-old son.[5]  The evidence is in dispute as to what
happened when Hill arrived at the residence, but it is clear that Hill returned
home shortly thereafter, for Jennifer. 
Jennifer and Hill then returned to check on Moore (who was not home at
the time) when Hill encountered Rouse.  A
scuffle ensued, and Rouse grabbed a rifle. 
As Hill and Jennifer turned to leave, Rouse shot Hill in the left side
of his face.  Rouse immediately
apologized and called for emergency medical assistance.  Meanwhile, Hill and Jennifer walked a short
distance to a neighbors house, and an ambulance was summoned.  Hill was transported to Good Shepherd Medical
Center and then transferred to Parkland Hospital in Dallas, where he underwent
multiple surgeries and a long period of convalescence.  Jennifer accompanied Hill to the hospital and
remained by his side until he was finally released in approximately November
2008.  

            Rouse
was arrested and photographed on the evening of the shooting.  He posted bail the following day, and
disappeared.  Approximately seven months
later, Rouse was arrested in Upshur County. 


II.        Factual Sufficiency of the Evidence

 

            When conducting a factual
sufficiency review of the evidence, we begin with the presumption that the
evidence was legally sufficient.  Jones v. State, 944 S.W.2d 642, 647
(Tex. Crim. App. 1996).  All evidence is
viewed in a neutral light, favoring neither party.  Steadman
v. State, 280 S.W.3d 242, 246 (Tex. Crim. App. 2009); Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006).  We are to determine if the evidence
supporting the verdict, although legally sufficient, is nevertheless so weak
that the verdict is clearly wrong or manifestly unjust or whether 




 

the verdict is against the great weight and preponderance of
the conflicting evidence.  Watson, 204 S.W.3d at 41415.

            While a
factual sufficiency review allows a very limited degree of second-guessing the
jury, the review should be deferential, with a high level of skepticism about
the jurys verdict before a reversal can occur. 
Roberts v. State, 220 S.W.3d
521, 524 (Tex. Crim. App. 2007); Watson,
204 S.W.3d at 417.  

            The factual
sufficiency of the evidence should be measured by the elements of the offense
as defined by a hypothetically correct jury charge.  Malik
v. State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); Hernandez v. State, 190 S.W.3d 856, 863 (Tex. App.Corpus Christi
2006, no pet.).  A hypothetically correct
jury charge in this case would require the State to prove beyond a reasonable
doubt that (1) Rouse (2) intentionally, knowingly, or recklessly (3) caused
bodily injury to Hill (4) by shooting Hill with a firearm.  

            There is no
dispute that Rouse shot Hill with a firearm, causing bodily injury to
Hill.  The dispute centers on Rouses
mental state.  Rouse contends that the
shooting was accidental.  The State was
required to prove, beyond a reasonable doubt, that Rouse intentionally, knowingly,
or recklessly shot Hill.  The jury was
properly instructed as to the definitions of the required mental state.  The mental culpability of a defendant is of
such a nature that it generally must be inferred from the circumstances in
which a prohibited act or omission occurs. 
A mental state is concealed within the mind of an individual, and can
only be determined from his or her words, acts, and conduct.  Moore
v. State, 969 S.W.2d 4, 10 (Tex. Crim. App. 1998).  We, therefore, review the testimony for
circumstantial evidence bearing on whether Rouse was intentional, knowing, or
reckless in shooting Hill.  

            A.        Testimony
of Rocky Hill

 

            Hills
testimony differs from that of Rouse and Jennifer, beginning with Rouses
conduct in the pub.  After they started
drinking, Hill testified that Rouse began to say things to irritate Hill.  When Rouse drinks, he gets ten foot tall
and he began to make comments indicating that he had sex with Hills mother.  This conduct persisted for over an hour, and
each time, Hill walked away to avoid conflict. 
While Hill admitted that his memory is not good due to several head
traumas, he did not recall any scuffling in the pub, just Rouse talking
smack.  

             When Jennifer was ready to leave, he had to
jump in the back of the truck because she was already driving away.  They left Rouse at the pub.  

            When Hill
and Jennifer got home, Jennifer asked Hill to go to Rouses to check on her son.
Believing Rouse to still be at the pub, Hill drove the short distance to Rouses
home, where he was met by Rouse pointing a gun at him when he got out of the
truck.  Rouse sent a few text messages to
Hill before Hill arrived at Rouses house, and Hill responded to those
messages.  The record does not indicate
the content of the messages from Rouse or Hills response to those
messages.  

            At that
point, Hill returned home and asked Jennifer to come with him to check on Moore,
because Rouse had a gun.  Hill returned
in spite of the fact that he was initially met at gunpoint because Jennifer was
determined to check on her son, and he was not going to let her go alone. 

 

            As Jennifer
was going into the house to check on Moore, Rouse came barreling out the door
around the porch.  The two scuffled and
wrestled.  Although Hill did not think he
struck Rouse during the scuffle, he might have done so.  When Jennifer came out of the house about a
minute later, Rouse and Hill were no longer scuffling, but they were
arguing.  Rouse was about six to eight
feet from Hill when Rouse pulled out the .22 rifle, which was leaning against
the porch.  Rouse pointed the gun at
Hill.  

            Hill
testified that Rouse had shot at him in the past, so Hill asked Rouse what he
was going to do with the gun.  Then, Hill
grabbed the gun and said shoot me then, at which point Rouse slung the gun to
the ground.  Hill had Jennifer by the arm
at that point, and they began to walk away. 
As they were walking away, Rouse yelled, and Hill turned around.  As he did so, the bullet caught him in the
left jaw.  Hill was eight to ten feet
from Rouse when he was shot.  Rouse ran
over to Hill to see if he was okay and rubbed him on the back.  Jennifer and Hill then walked a short
distance to a neighbors house to call an ambulance.  As they were walking away, Rouse called 9-1-1.  

            After the
criminal case was filed, Hill and Jennifer visited two or three times with the
county attorney.  When Jennifer learned
the case was going to court, she left Hill, and Hill did not see her again
until the time of trial.  




 

            B.        Testimony
of Jennifer Rouse

 

            Jennifer testified that as they were leaving for the
pub, Rouse was standing in his yard, and Hill invited him to join them.  Jennifer did not think this was a good idea
because Hill and Rouse do not get along, and Hill is not a good person to be
around when he is drinking.  

            While at the
pub, they laughed, talked, played pool, and had a good time.  When Jennifer went outside to leave (at approximately
9:30 or 10:00 p.m.), she heard hollering from the pub and went back
inside.  Hill had started to pick a fight
with Rouse, and head-butted Rouse. 
Irritated with Hills behavior, Jennifer got in the truck and drove
away.  Hill chased her down and jumped in
the back of the truck.  

            When they
returned home, Hill got in the truck and said he was going to go finish this.
After he left, Jennifer could hear Hill screaming and hollering at Rouses
house.  Hill returned home a short while
later and told Jennifer she needed to go over and check on her son and that if
she did not get in the truck, he would put her in the truck.  When they arrived at Rouses home, Jennifer
went into the house looking for Moore, but he was not there.  As she was coming out of the house, Jennifer
heard Hill screaming at Rouse, and then saw Hill hit Rouse in the face.  Rouse threw his hands up, said he did not
want to fight, and asked Hill to leave. 
Hill did not relent, and hit Rouse a few more times in the face.  Hill then went to his truck saying, Ive got
something for you. 




 

            Hill does not
own a gun, but he carries brass knuckles, tools, screwdrivers, and wrenches
under the seat of his truck.  Hill
returned with his hand behind his back. 
At that point, Rouse grabbed the gun. 
Hill grabbed the gun, put it to his own face, and told Rouse to
shoot.  Hill then shoved the gun back,
and Rouse fell down while still holding the gun.  Jennifer was already walking toward the truck
when she heard the gunshot.  Hill grabbed
her arm and said, [L]ets go.  Then, he
put his hand on his mouth and, when he pulled his hand away, he was
bleeding.  After Rouse shot Hill, Rouse
put his hand on Hills shoulder and told him that he was sorry and that he did
not mean to shoot him.  

            Jennifer
heard Rouse calling 9-1-1 from his cell phone as she and Hill walked a short
distance to a neighbors house for help. 


            Jennifer
testified that she told Shawn Cox, an investigator with the Marion County Sheriffs
Office, everything she knew about the shooting incident.  She did not, however, tell Cox about the
argument at the pub or about the head-butting incident.  Jennifer testified that Hill asked her not to
say anything to Cox about the fact that Hill went back to the truck to get
something just prior to the shooting. 
In her statement to Cox, Jennifer did not indicate that Hill forced her
to the truck to go to Rouses house.  In
fact, she told Cox they went to Rouses to check on Moore.  Likewise, Jennifer said nothing to Cox about
Hill hitting Rouse in the face or knocking Rouse down with the rifle.  She simply told Cox that as she and Hill
turned to leave, Hill grabbed her by the arm and she heard the shot.  




 

            Jennifer
admitted at trial that her trial testimony differed from her statement to
Cox.  Jennifer explained that as the
trial date drew near, Hill told her to repeat her original statement, and she
did not want to risk going to jail by doing so. 
Jennifer was afraid of Hill; he was very controlling, aggressive, and
violent.

            C.        Testimony
of Ashton Moore

 

            Moore testified that he has known Hill for ten years
or more, since his mother (Jennifer) and Hill have been together.  Even though Hill and Moore are not related,
Moore thinks of Hill as a member of the family. 


            Moore has
seen Hill fight before, but not with a weapon. 
He has never seen Hill use anything but his fists in a fight.  Hill fought Kyle Roller once, but did not use
weapons.  

            Rouse is
Moores uncle, and Moore and he live next to each other.  Moore lives in the trailer his grandmother
left to him, and Rouse lives in a little building next to it.  

            Moore knows
that when Rouse drinks too much, he gets aggressive.  Rouse has been physically aggressive with
Moore, and has slapped him.  

            Rouse has
threatened to kill Hill plenty of times. 
Moore recalls an incident in which Hill and Rouse got into an argument
and Rouse fired the .22 rifle in the direction Hill was hiding.  After having shot at Hill, Rouse did not say
anything, he just smiled like always.  Hill
testified that Rouse just always got a smile. 


            Moore was
not home at the time of the shooting, but became aware of it when Hill and
Jennifer arrived at the neighbors house where Moore was visiting.  After getting help, Moore walked to Rouses
house where he found Rouse standing on the porch.  Rouse did not act worried, and he had a
little smirk like he had done something. 
When Moore asked Rouse what happened, Rouse simply said, I shot
Rocky.   

            According
to Moore, Rouse usually kept the rifle in the house, in the corner of his
room.  

 

            D.        Testimony
of Roy Raymond Rouse, Jr.

 

            Prior to the
day of the shooting, Rouse and Hill had arguments, but only one that resulted
in a physical altercation, approximately fifteen years earlier.  Moores testimony that Rouse threatened to
kill Hill prior to the night of the shooting and in fact had fired that same
gun at Hill in the past, was untrue. 
Hill had been physically aggressive toward Jennifer several times in the
past, and he was under a protective order. 
Hill and Jennifer reunited in spite of the protective order.  

            Rouse
witnessed Hill fight Roller approximately two years before the shooting.  In that fight, Hill used a beer bottle, an
extension for a ratchet, and a WD-40 can. 


             While at the pub, Hill, Jennifer, and Rouse
played pool and drank beer; there were no disagreements.  Not long before Jennifer decided to leave,
Hill accused Rouse of saying some things, and Hill head-butted Rouse.  Rouse denied saying anything to incite
Hill.  

            After
Jennifer and Hill left, Rouse got a ride home from the pub with a friend.  While at home, Rouse received three or four
text messages from Hill, one of which called Rouse out to fight, but Rouse did
not respond.  Instead, he decided to
relax and watch a movie.  It was not long





 

before Rouse heard Hill out in the street screaming at him.
Rouse chose to remain in the house.  He
never handled the gun or went outside.  

            Approximately fifteen minutes later, when Rouse was
outside using the restroom, Hill and Jennifer arrived in Hills truck.  When Rouse came around the building, Hill was
standing by the road.  Upon seeing Rouse,
Hill charged him and punched him twice in the face.  Rouse did not attempt to return the blows,
but did try to block them.  Rouse told
Hill he did not want to fight and asked him to leave several times.  After hitting Rouse, Hill ran to his truck
and told Rouse he had something for him. 
Hill proceeded to look under the seat of his truck where Rouse knew Hill
kept tools, wrenches, and brass knuckles. 

            As Hill
returned from the truck, Rouse grabbed the gun from the porch and stuck it out,
trying to keep Hill away.  Hill reached
up with one hand and grabbed the gun and said, [I]f youre going to shoot me,
shoot me.  Hill then shoved Rouse
backward, and Rouse fell down.  Rouse was
holding the rifle with his right hand, and his hand was around the
trigger.  When Rouse hit the ground,
Hill was still telling Rouse to shoot him. 
In a matter of seconds, the gun fired.  
Rouse did not aim the gun, and only had it in his hand because he
thought Hill was coming at him with some type of weapon.  Rouse never saw a weapon and was not hit with
a weapon.  The two were only a foot or so
apart when the gun fired.  

            When Rouse
pulled the gun out, he had no intent to use it, and did not know it was
loaded.  The gun accidently went off in
his hand.  Hill was facing Rouse when the
gun fired, and when Hill grabbed Jennifers arm, Hill had nothing in his hands.
 

            After the
shot was fired, Rouse called 9-1-1 for help. 
Rouse did not tell the 9-1-1 operator the shooting was an accident.  Rouse did not tell the dispatcher or the
deputies who investigated the shooting that Hill went to the truck for a
weapon. 

            Rouse
testified that he usually keeps the safety of the rifle on and does not keep a
round in the chamber at all times.  He
does not know why the gun was loaded. 
When the gun fired, the safety was off, a round was in the chamber, and
Rouse had his finger on the trigger.  

            Rouse was
arrested and photographed on the night of the shooting.  At trial, Rouse could only identify one area
on one photograph that appears to be a bruise. 


III.       The Evidence Is Factually Sufficient

 

            Rouse
contends that a neutral review of all of the evidence demonstrates that proof
of his guilt is so obviously weak as to be clearly wrong, manifestly unjust,
and against the great weight and preponderance of the conflicting
evidence.  Watson, 204 S.W.3d at 41415. 
Rouse points out that Hills memory is by his own admission
unreliable.  Further, Rouse contends that
the presence of blood splatter on his clothing, coupled with his immediate
apology, weigh against Hills version of events and corroborate Rouses version
that the shooting was accidental.  

            Rouse
further calls into question the States failure to produce medical or other
expert testimony that could have shown the distance from which the gun was
fired.  Rouse had (as described by Cox)
blood on his hands and a little bit of blood splatter on his clothes.  The State could have produced an expert,
contends Rouse, to explain whose blood it was and the significance of the
splatter.  

            Rouse
contends that if Hill pushed him down (as Rouse testified) and the rifle
accidentally fired as he fell, it would be reasonable to see some blood
splatter on Rouses clothes and the possibility of this would decrease as the
distance between Rouse and Hill increased. 
If Hills version of events is correct, and Rouse slung the gun down and
then picked it up and aimed it at Hill as he was walking away, there would be
no blood splatter on Rouses clothing as a result of the shooting.  

            Rouses
theories on blood splatter and the location of same were not presented to the
jury.  There was no expert, as Rouse
points out, called by the State or by Rouse, to explain the significance of
blood splatter to the jury.  Further,
such discrepancies were not pointed out to the jury in argument of counsel at
the conclusion of the case.  The only
evidence before the jury on this issue was Coxs testimony that a single
photograph introduced by the State depicted a small blood splatter in the upper
right pocket area of Rouses pants.  The
jury could have inferred, from looking at this photograph (and in comparison
with the photographs of the pants worn by Hill at the time of the shooting,
which were covered in blood) that indeed, Rouse was six to eight feet away at
the time the rifle was fired.  

            Next, Rouse
claims that Jennifers testimony raised a reasonable hypothesis that the
shooting was accidental and that Rouse, therefore, did not have the culpable
mental state necessary 




 

to sustain a conviction for aggravated assault.  Rouse submits that this Court is bound to
consider that reasonable hypothesis.  Santellan v. State, 939 S.W.2d 155, 164
(Tex. Crim. App. 1997).

            A reviewing
court conducting a factual sufficiency analysis necessarily considers any reasonable
alternative hypothesis raised by the evidence.  The very nature of a factual sufficiency
review requires the court to consider all of the evidence presented at trial
and not just that which is favorable to the verdict. See Cain v. State, 958 S.W.2d 404, 408 (Tex. Crim. App. 1997).  However, the mere existence of an alternative
reasonable hypothesis does not render the evidence factually insufficient.  Even when an alternative reasonable hypothesis
is raised by the evidence, the standard of review remains the same.  A verdict may be overturned only if it is so
contrary to the overwhelming weight of the evidence as to be clearly wrong and
unjust.  See Clewis v. State, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996). 

            Jennifers
trial testimony tends to support the claim of an accidental discharge of the
firearm.  However, Jennifers credibility
was called into question because her trial testimony differed in several
important respects from the statement she gave to Cox shortly after the
shooting.  Jennifer admitted at trial to
giving two completely different versions of what occurred on the evening of
August 10, 2008.  While Jennifer
testified that Hill head-butted Rouse in the pub and hit Rouse several times in
the face later at Rouses house, the physical evidence tends to corroborate at
least that portion of Jennifers statement to Cox, in which she failed to
mention the hitting and head-butting. 
The jury saw photographs which do not indicate the presence of injury to
Rouses face consistent with Jennifers testimony.

            Even though
Jennifer explained that her statement to Cox was incomplete because she was
afraid of Hill, the jury was free to disregard any part of Jennifers testimony
it did not find credible.  Barnes v.
State, 876 S.W.2d 316, 321 (Tex. Crim. App. 1994) (it is within exclusive
purview of jury to determine credibility of witnesses and weight to be given to
statement of a witness).  In this case,
the jury apparently was not convinced that Jennifers courtroom testimony was
entirely credible.  

            Rouse
complains further that Hill qualified several of his answers with the
explanation that his memory was not good due to several head traumas when
testifying that he did not think there was any physical contact at the pub and
that he could not remember if he sent derogatory text messages to Rouse after
they left the pub.  In reviewing all of
the evidence, we again note no physical injury to Rouse, which tends to
corroborate Hills testimony.  

            Hills
testimony is further corroborated by Moore, who testified that when Rouse
drinks too much, he gets aggressive.  Hill
testified that when Rouse drinks, he gets ten foot tall.   Moore further testified that Rouse
previously fired the .22 rifle at Hill when the two were arguing.  Hill also testified that Rouse shot at him in
the past.  

            Rouses
immediate apology to Hill and his 9-1-1 call after the shooting tend to
corroborate his contention that the shooting was accidental.  We believe Rouse cites sufficient conflicting
evidence to support an argument that another reasonable jury, weighing the
evidence and assessing the credibility of the witnesses, could have reached a
different verdict from the one reached by this jury.  Upon objective review of the record, however,
we cannot agree with Rouse that the evidence supporting the verdict is so weak
as to be clearly wrong or manifestly unjust. 
We further do not find the verdict to be against the great weight and
preponderance of the conflicting evidence. 
We, therefore, conclude that the evidence is factually sufficient to
support the verdict of guilt.

            Accordingly,
we affirm the judgment.

 

 

 

 

                                                                                    Jack
Carter

                                                                                    Justice

 

Date Submitted:          January
29, 2010         

Date Decided:             February
24, 2010

 

Do Not Publish           

 

            

            

 

 

            

 

 











[1]Section
22.02(a)(2) of the Texas Penal Code provides that [A] person commits an
offense if the person commits assault as defined in § 22.01 and the
person:  . . . (2) uses or exhibits a
deadly weapon during the commission of the assault.  Tex.
Penal Code Ann. § 22.02(a)(2) (Vernon Supp. 2009).  Under Section 22.01 of the Texas Penal Code,
a person commits assault if the person:

 

(1)
intentionally, knowingly, or recklessly causes bodily injury to another,
including the persons spouse; 

 

(2)
intentionally or knowingly threatens another with imminent bodily injury,
including the persons spouse; or

 

(3)
intentionally or knowingly causes physical contact with another when the person
knows or should reasonably believe that the other will regard the contact as
offensive or provocative.

 

Tex. Penal Code
Ann. § 22.01(a) (Vernon Supp. 2009).

 

 





[2]Jennifer
is Rouses sister.  

 





[3]Rouse
was on community supervision for burglary on the date of the shooting, and as a
result, was not permitted to consume alcoholic beverages or to keep or maintain
firearms.  

 





[4]Much
of the testimony regarding the events of the evening of August 10, 2008, is
disputed.  The background provided here
is based on that testimony which is undisputed.

 





[5]Moore
resided at 189 Waterwood Loop, in a residence left to him by his deceased
grandmother.  Rouse lived in a small
building within a few feet of Moores residence.