NO. 07-11-00451-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

NOVEMBER 26, 2012

_____

ANDREW PAUL JIMENEZ, APPELLANT

v.

THE STATE OF TEXAS, APPELLEE

_____

FROM THE 320TH DISTRICT COURT OF POTTER COUNTY;

NO. 60,438-D; HONORABLE DON R. EMERSON, JUDGE

_____

Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.

**MEMORANDUM OPINION**

Appellant, Andrew Paul Jimenez, appeals his conviction for murder[1] and the resulting twenty-five year sentence. He challenges the sufficiency of the evidence that would show him as the person who, in 1990, shot Clarence Smith in a bar parking lot. We will affirm.

Factual and Procedural History

On a stormy summer night in July 1990, Smith was fatally shot in the parking lot outside the Western Lounge in Amarillo. Though police gathered evidence in the early

---

[1] See TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011).

morning hours after the shooting that implicated appellant as the shooter, the case grew cold and more than two decades would pass before a jury would hear the evidence and, ultimately, decide that appellant was the man who shot and killed Smith.

The cold case was revisited a couple of times during the intervening years, at which times investigators gathered a bit more evidence from witnesses. Ultimately, trial was held twenty-one years after the 1990 Western Lounge incident. In October 2011, the jury heard testimony from officers who investigated the shooting back in 1990 and several witnesses to the shooting. Despite some inconsistencies in the testimony and some confusion as to the exact sequence of the events of that evening, the Potter County jury found appellant guilty of murder. The trial court sentenced him to twenty-five years' imprisonment. Appellant appeals, bringing to this Court one issue in which he challenges the sufficiency of the evidence to support his conviction.

Standard of Review

In assessing the sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Brooks v. State, 323 S.W.3d 893, 912 (Tex.Crim.App. 2010). "[O]nly that evidence which is sufficient in character, weight, and amount to justify a factfinder in concluding that every element of the offense has been proven beyond a reasonable doubt is adequate to support a conviction." Brooks, 323 S.W.3d at 917 (Cochran, J., concurring). We remain mindful that "[t]here is no higher burden of proof in any trial, criminal or civil, and there is no

higher standard of appellate review than the standard mandated by <u>Jackson</u>." <u>Id.</u> When reviewing all of the evidence under the <u>Jackson</u> standard of review, the ultimate question is whether the jury's finding of guilt was a rational finding. <u>See</u> <u>id.</u> at 906–07 n.26 (discussing Judge Cochran's dissenting opinion in <u>Watson v. State</u>, 204 S.W.3d 404, 448–50 (Tex.Crim.App. 2006), as outlining the proper application of a single evidentiary standard of review). "[T]he reviewing court is required to defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony." <u>Id.</u> at 899.

## Analysis

Appellant challenges the sufficiency of the evidence that would show that he was the shooter. In his challenge, he points to the inconsistencies among the accounts offered by those who witnessed the shooting in 1990 and the questionable credibility of many of those same witnesses who testified at trial. He also points out that a gunshot residue test was not performed on appellant and that the State never produced any registration information relating to the car with New Mexico license plates that was noted by a number of witnesses as the car the shooter was driving. The State concedes that many of the witnesses who identified appellant at trial were convicted criminals and may not have demonstrated "sterling" veracity in the past. Nonetheless, the State urges, their testimony was not so inconsistent and unreliable that the jury could not have rationally concluded that it was appellant who shot Smith in July 1990.

The most detailed account of the night leading up to the shooting came from Beverly Degrate, Smith's then-fiancée, who was present at the shooting. She explained

3

that she and Smith went out that night to drink, dance, play pool, and celebrate their engagement. At the same time, apparently, a number of their friends and acquaintances had gathered to celebrate a friend's birthday. Eventually, they would all end up at the same bar: the Western Lounge. After Degrate and Smith arrived at the Western Lounge, Smith sat down with a friend, Big Mike, and the two men visited and had beers together. Degrate decided to play pool at a nearby table.

As she played pool, Degrate noticed three Hispanic men who repeatedly came in the front door of the bar and left out the back door. While Degrate was at the pool table, one of the men approached her and, as he gestured toward the table where Smith and Big Mike were sitting, asked Degrate if that was her boyfriend. She responded by asking, "Which one?" The man did not answer and, instead, walked away and rejoined his friends, and the three men again left out the back door. Degrate reported her observations and the encounter to Smith and Big Mike. Smith dismissed her concern as her being "too paranoid." Big Mike explained that he had "put out" the three men earlier following an incident between them and a female bartender. He, too, dismissed Degrate's concerns, predicting that the men probably would be back in the bar but that they were not going to do anything. The three men did, in fact, continue to come in and go out of the bar, and Degrate noticed that they often paused at the table where Smith and Big Mike were sitting. She explained that Smith and Big Mike were similarly built and both were wearing black hats, but of different styles, leading her to surmise that the three men were confused by Smith's and Big Mike's physical resemblance.

4

At closing time, Smith, Big Mike, and two other friends left out the front door of the bar. Degrate decided to finish her pool game with family friend, Tyrone Anderson. A couple of minutes later, the pool game was over, and Degrate left the bar with Anderson and another friend. Anderson and the friend left toward Anderson's car in one direction, and Degrate headed in another direction toward her car. As she crossed the main parking lot toward the nearby parking lot where her car was located, she noticed a stationary car with its headlights on. She crossed the parking lot and continued to where Smith and Big Mike were standing near their cars. As Degrate headed toward the passenger side of the car, Smith moved around and unlocked her door.

After Smith unlocked the door, a car pulled up and stopped at a point about five to six feet away from the couple. The man on the driver's side announced to Smith that Smith was the man's intended target. Smith started toward the car, but Degrate discouraged him from approaching. At that point, Degrate saw a blonde woman in the middle of the front seat lean forward, and the driver extended his arm out of the window and fired a single gunshot. Degrate recognized the driver as one of the three Hispanic men who had been coming in and out of the bar that night; he was the one who had approached her to ask about her boyfriend. Degrate noticed that the car had New Mexico license plates but did not notice the color of the car. She observed that six people were seated in the car, three males and three females. A backseat passenger, whom Degrate recognized as the most nicely dressed of the three Hispanic men from earlier, encouraged the driver to leave after the shot was fired.

5

Degrate then realized that Smith had been shot. She turned to him to see blood pouring "like a faucet" from the bullet hole in his chest. She tried but was unable to hold him up, and he fell forward onto the ground. She sat and held his head in her lap until police arrived. Smith was pronounced dead at the scene. Police took Degrate to the police station before she learned that Smith had died. There she was able to identify appellant as the shooter from a photographic line-up.[2]

Mark Fox was also present at the Western Lounge that night, and he also testified at the trial years later. A prison inmate at the time of trial, he explained that he spent his birthday at the Western Lounge on July 21–22, 1990. He was friends with Smith and Big Mike and others in the extended network of friends and acquaintances, and he, too, left the bar at about closing time. As he was getting into his car, he observed a man shoot Smith from the driver's side of a car but could not describe the car. Fox, too, identified appellant as the shooter from a photographic line-up shortly after the shooting. Though Fox did not know appellant personally, he recognized appellant as someone he had seen around before. He had seen appellant in the bar earlier that night, had been introduced to him previously by Geronimo Martinez, and knew appellant as a "brother" to Martinez, the same man who gave police appellant's name that early morning after the shooting. Fox testified that he had not been offered or promised any kind of leniency or special treatment in exchange for his testimony.

---

[2] Police had prepared the photographic line-up based on information received from another witness, Geronimo Martinez, who was at the bar that night and knew appellant personally. We note that Degrate admitted that, when she signed the photographic line-up identifying appellant as the shooter, she identified herself by her sister's name because Degrate had a warrant for her arrest based on an unpaid speeding ticket.

6

Although he testified that he recalled the car facing a different direction and having to turn around before exiting the parking lot, he admitted that some of his memories of the incident were "foggy" as a result of the passage of time.

Edward Jowers, too, was present at the time of the shooting and testified at trial that he knew Smith casually and had gone to the Western Lounge for the birthday celebration but also had played some pool with Smith. He recalled walking out of the bar with Smith and, he recalled, Degrate. They said their goodbyes as they walked toward their cars, paused at the car Smith was driving, and Jowers went to shake Smith's hand in parting. At around that time, Jowers heard the gunshot. He had not been paying attention and did not notice the car approaching but, after the shot was fired, saw the car leaving and recalled there being four people in the car. At trial, he did not independently recall the color of the car. In his statement taken shortly after the incident, however, he described the car as "a light grayish-blue, small Chevrolet or Pontiac." Jowers testified that the car had New Mexico license plates. He admitted that he has a criminal history but had served his prison sentence years ago.

David Bernal was friends with appellant for many years and is appellant's former brother-in-law, having been married at the time of the shooting to one of appellant's sisters. He recalled getting a phone call from appellant in the wee hours of the morning of July 22, 1990, reporting that appellant had had an accident and asking Bernal to pick him up downtown. Bernal and his wife went downtown to look for appellant but were unable to locate him. They called appellant's wife to check on appellant's whereabouts. After speaking with her, Bernal and his wife drove to appellant's apartment where

7

appellant would soon join them, bearing some abrasions and some blood on his arms and being scolded by his wife regarding the whereabouts of her missing white Cutlass.

Shortly after arriving at the apartment, appellant asked Bernal if he knew a Richard Ramos, a man said to resemble appellant physically. Appellant then explained that there had been a shooting where both he and Ramos were that night and suggested that Ramos was the shooter. Appellant expressed concern that he would be blamed for the shooting because he had been in a heated exchange with the shooting victim earlier that night and because he and Ramos looked so much alike. Appellant claimed that the car he was driving that night—his wife's white Cutlass—had been stolen, but he also claimed to have had a car accident as he fled away from the bar in fear of being blamed for the shooting.

The next day, appellant's cousin and a friend came by Bernal's house and asked if they could hide a light blue car at Bernal's house. Bernal declined. The two men did not inform Bernal of the reason they needed to hide the car. Bernal explained that he did not know the make or model of the car but added that he thought the car had New Mexico license plates and seemed to recall it being a "newer" model. Bernal admitted that he did not report this information to police back in 1990.

Kevin Ward is appellant's former cellmate to whom appellant confessed to being the shooter. Ward testified that, when appellant received a letter bearing news that the murder investigation was underway again, it prompted a conversation between Ward and appellant about the murder. Appellant told Ward that he had shot a man in the parking lot of a bar in Amarillo "a long time ago." Initially, Ward was reluctant to talk to

8

investigators about what appellant had told him. First, he wanted to wait until he and appellant were no longer cellmates. Later, his reluctance was fueled by appellant's mention of having talked to a witness who had spoken to police back in 1990; Ward feared appellant might seek vengeance against him. Ward testified he was not promised any favors or special treatment in exchange for his testimony; he decided to testify and share what appellant told him because it was the right thing to do, even though he still expressed a lingering reluctance about doing so.

Ward gave a statement in 2007 which recounted that appellant had told him that he had killed a Hispanic male in a bar parking lot. Appellant points out that Ward's 2007 statement regarding appellant's account of the shooting misidentifies Smith's ethnicity. Based on this detail, appellant urges that Ward's testimony should be discredited: "the snitch gets the details of Appellant's 'confession' wrong." At trial, Ward testified that he did not know the victim's ethnicity.

Tyrone Anderson also testified at trial. Anderson's mother had married the father of Smith's sister-in-law years ago, so he knew Smith in 1990 and also knew many of the other bar patrons that night. Recently released from the penitentiary, Anderson testified that he saw a small two-door car—"like a Cutlass or something"—approach Smith and Degrate and heard a shot fire from the vehicle. He recalled that there were four occupants in the car. He, like Fox, was familiar with appellant and knew him by sight. And Anderson testified that it was appellant who was driving that car that night. After he ran over to Smith and Degrate and saw what had happened, he and another friend got into Anderson's car and tried to chase down the suspect's car but were not successful

9

in locating them. They returned to the bar. However, when police arrived, Anderson was successful in avoiding any interaction with them; he did so because he knew he had an outstanding warrant for his arrest.

Anderson testified that, in 1996, he met up with appellant and that, during that interaction, appellant denied that he was the shooter. Because Anderson had some "swindling" operations planned, he chose not to reveal to appellant the fact that he had, in fact, seen appellant as the shooter. Appellant asked Anderson to testify for him and identify the shooter as someone else, a man named David Martinez. Shortly after this interaction, Anderson and appellant met again while both men were in county jail, and appellant urged Anderson to talk to appellant's lawyer. Anderson did arrange a meeting with police at which he recited the story as he and appellant had agreed: David Martinez was the shooter. Eventually, though, Anderson began to feel remorseful about lying in a way that affected his family and did provide police with his true account of the incident in which he identified appellant as the actual shooter.

As is obvious, the record is not without inconsistencies regarding the exact sequence of events that night. For instance, it is unclear with whom Degrate walked out of the bar and where Jowers was in relation to Smith at the time of the shooting. Further, the record contains conflicting descriptions of the make, model, and number of occupants of the car the shooter was driving that night. It is also true that many of the witnesses who testified at trial have a criminal history. Some of the witnesses admitted that their recollection of the events of that night had become clouded by the passage of time; Anderson admitted to having intentionally misled investigators at one point. The

10

witnesses' accounts—though inconsistent in some respects—were nevertheless consistent in identifying appellant as the man who shot Smith. And it is well-established that resolution of conflicts and inconsistencies in the evidence is the province of the jury as trier of fact. See Bowden v. State, 628 S.W.2d 782, 784 (Tex.Crim.App. 1982) (op. on reh'g); see also TEX. CODE CRIM. PROC. ANN. art. 38.04 (West 1979). Because resolution of conflicts or inferences therefrom lies within the exclusive province of the jury, it may choose to believe all, none, or some of the evidence presented. See Heiselbetz v. State, 906 S.W.2d 500, 504 (Tex.Crim.App. 1995) (en banc). The jury is also the exclusive judge of the credibility of witnesses. Barnes v. State, 876 S.W.2d 316, 321 (Tex.Crim.App. 1994) (en banc) (per curiam). Here, there is sufficient evidence from which the jury could determine that it was appellant who fatally shot Smith in the summer of 1990. We overrule appellant's sole point of error.

## Conclusion

Having overruled appellant's sole point of error, we affirm the trial court's judgment of conviction.

Mackey K. Hancock
Justice

Do not publish.