

# NUMBER 13-22-00242-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

EDUARDO SALDIVAR-LOPEZ
A/K/A EDUARDO SALDIVAR,                                    Appellant,

v.

THE STATE OF TEXAS,                                          Appellee.

## On appeal from the 197th District Court
## of Cameron County, Texas.

# OPINION

**Before Chief Justice Contreras and Justices Benavides and Longoria**
**Opinion by Chief Justice Contreras**

Appellant Eduardo Saldivar-Lopez a/k/a Eduardo Saldivar challenges his

conviction of continuous sexual abuse of a young child, a first-degree felony for which he

was sentenced to twenty-five years' imprisonment. *See* TEX. PENAL CODE ANN. § 21.02(b).

On appeal, Saldivar argues the trial court abused its discretion by denying his motion for mistrial after the child's mother gave allegedly inadmissible testimony. We affirm.

## I.    BACKGROUND

On February 3, 2021, Saldivar was indicted for committing two or more acts of sexual abuse against his daughter, B.A.S.,[1] a child under the age of fourteen, from on or about June 1, 2019, through April 20, 2020. Saldivar pleaded not guilty. A jury trial commenced on May 10, 2022.

### A.    Trial

Saldivar married Brenda Ruelas in 2004 and the couple had four children together, including B.A.S. The couple separated in 2017 and Saldivar moved out of the family home and moved in with his sister, Nancy Saldivar-Villano.[2] Saldivar and Ruelas continued to have a cordial relationship after their separation. Their four children would often see Saldivar at their family's home or spend time with him at his sister's house.

Ruelas testified that she first learned of Saldivar's abuse of B.A.S. from her eldest son in August 2020. Immediately after that conversation, Ruelas talked with B.A.S. about the alleged abuse. B.A.S. started to cry and told Ruelas that Saldivar "had been touching her" and it had "been going on for about a year." Ruelas testified that B.A.S. told her that Saldivar would touch her, smell her, kiss her on the neck and ear, and touch her private area over her clothes. According to Ruelas, B.A.S. said this happened about six or seven

---

[1] To protect the identity of the minor child, we refer to her by her initials. *See* TEX. CONST. art. I, § 30(a)(1) (providing that a crime victim has "the right to be treated . . . with respect for the victim's dignity and privacy throughout the criminal justice process").

[2] The couple did not formally divorce until around the time of Saldivar's arrest.

times from June 2019 until April 2020 and would always occur at night when Saldivar was drunk. Ruelas stated that B.A.S. was thirteen at the time of this outcry.

B.A.S. testified that the abuse began at Villano's house when she was twelve or thirteen years old. Villano's home had four bedrooms, which were all occupied by different family members. When the children spent the night there, all four children would sleep in Saldivar's bedroom, or two of B.A.S.'s brothers would sleep on the couches in the living room. B.A.S. would always sleep in Saldivar's bed with him and her youngest brother.[3]

B.A.S. described two incidents of abuse happening at night in Saldivar's bedroom. She described one incident where she woke up from feeling Saldivar's breath on her neck and his arm around her with his hand on her stomach. His hand went lower, and he began to touch her "private area," or vagina, over her clothes. She tried to move his arm but he "just kept his hand on [her]" and would not move. She turned to her other side so "that he could move," but "he kept turning [her] back." After some time, he stopped. B.A.S. said her youngest brother was in the bed when this occurred, but no testimony showed that he was aware of it.

During the second incident, B.A.S. described waking up to the sound of Saldivar entering the bedroom. He got into the bed and started "touching [her] shoulder." He then "put [her] on top of him" and put his arms around her back. B.A.S. testified that she "could feel his private area" on her stomach. She tried to get off of him but found she could not move. Eventually she "ended up getting off of him," and "he was just there touching on [her] stomach" until he got up and left.

---

[3] There was conflicting testimony about whether B.A.S. would occasionally sleep in bed with her aunt or grandmother and whether there was an air mattress in the bedroom.

The other incidents of abuse occurred when Saldivar stayed at the family home in 2020. From September 2019 to June 2020, Ruelas began working in another city and would spend weeks at a time out of town. She invited Saldivar to stay at the family home to take care of the children. Like the sleeping arrangement at her aunt's house, B.A.S. and her youngest brother would sleep with Saldivar in his bed in the master bedroom. According to B.A.S.'s testimony, though she had her own room at her house, "my dad would always want me to sleep in the room with him."

B.A.S. described the last incident of abuse happening in the family home's master bedroom in April of 2020. She was in bed and Saldivar came into the bedroom from the garage. He laid down next to her and put his arm around her and his hand on her stomach and again moved his hand down and started touching her "private area." B.A.S. got up crying and went into her eldest brother's room. When her brother asked her what was wrong, she told him that Saldivar had "touched" her. B.A.S.'s eldest brother confirmed at trial that B.A.S. came into his room that night crying and told him that Saldivar had touched her. B.A.S.'s twin brother testified that he saw B.A.S. go into the eldest brother's bedroom crying that night but did not learn why she was crying until the following day. Sometime after B.A.S. left the room, Saldivar called for B.A.S. and they talked in the garage. B.A.S. testified that Saldivar told her he was sorry and begged her not to tell anyone. He cried and told her that he would shoot himself if she told anyone.

The State introduced testimony from Sonja Eddleman, a coordinator with the Child to Adult Abuse Response Team (CAART). Eddleman attested to B.A.S.'s interview with a medical examiner that took place the day after her outcry to Ruelas. Eddleman did not interview B.A.S. but testified that her exam records showed that B.A.S. said Saldivar

4

"would come and lay next to [her]" when she was asleep, and he would touch her stomach and "would go down and touch [her] private area." Eddleman indicated that B.A.S. reported that he always touched her over her clothes, and she would turn around to stop him from touching her. B.A.S. also said that the incidents of abuse happened six times and had been going on for about a year. According to Detective Jose Martinez, B.A.S. generally repeated these same details during her interview with a forensic investigator.

The jury also heard from the defense's witnesses—Saldivar, Villano, and Maria Teresa Lopez, Saldivar's mother. Villano testified that B.A.S. made an initial outcry to her about a year before her outcry to her mother, but Villano did not tell Ruelas because she did not believe B.A.S., saying that it was "not the first serious lie" that B.A.S. has told. Similarly, Lopez testified that she talked with B.A.S. after her outcry to Villano. She similarly did not believe her because B.A.S. had told "big lies" in the past. She also said that B.A.S. told her and Villano that Saldivar had only touched her breasts.

Saldivar and Villano testified that B.A.S. was lying about the abuse because Saldivar was strict with her. He did not allow her to wear makeup, use social media, talk with boys, or have a boyfriend. He would regularly check her phone and would take it away if she violated his rules. Saldivar denied B.A.S.'s accusations of abuse and testified that B.A.S. was lying to get "[him] out of the picture" so that she could "do what she's doing now," including having sex. Saldivar described how, on the day B.A.S. made her outcry to her aunt, he had taken away her phone because he found an explicit video of her masturbating in the shower. On the night she cried to her older brother, Saldivar disciplined B.A.S. for having a conversation via FaceTime with a boy while she was in bed, which he strictly prohibited.

5

**B. Motion for Mistrial and Request for Instruction**

In a pre-trial hearing, without jurors present, Saldivar requested that the court admonish Ruelas not to testify about incidents not relevant to the trial, including alleged abuse by Saldivar towards Ruelas and relationships from Saldivar's past. Saldivar's counsel stated during the hearing:

> Based on discovery I've gotten from the State, just that there was—that, supposedly, my client was abusive to Ms. Ruelas, that there was an incident where my client, allegedly, pointed a firearm at Ms. Ruelas. And, then, there are some incidents involving other females, adult females. One of them went all the way back 22 years . . . . And none of that—and the State agrees that none of that material, at this point, unless somehow the door is opened—[is relevant] so we're asking that the witness be admonished that she just can't throw that out there in front of the jury, unless she's specifically asked.

The court granted the request and restricted Ruelas's testimony as it related to "any alleged abuse towards [her], any incidents involving guns, any girlfriends or relationships that [Saldivar] may have had with adult women or adult men, for that matter, period." Ruelas stated under oath that she understood the court's instructions.

Later, Ruelas testified that when she found out about the abuse from B.A.S., she attempted to contact Saldivar to confront him. Saldivar picked up the phone once but hung up and did not pick up subsequent calls from her or the children at all that night. In order to get Saldivar to come to the house, Ruelas falsely told him that their youngest son was sick. Saldivar did not come to the house that night. During trial, the following testimony took place:

| [The State]: | That evening, when you're trying to get the defendant to show up to the house so you can confront him about what you've learned, was there a plan in place with you and your children? |
|---|---|
| [Ruelas]: | Yes, ma'am. |

6

| [The State]: | What was that plan? |
| [Ruelas]: | We wanted [Saldivar] to come in. One of [my kids] was going to record what he was saying, and then we were going to call the cops. |
| [The State]: | And did you take any safety precautions just in case? |
| [Ruelas]: | I have—I have my weapon. I wasn't going to do anything with it, but I was scared that he was going to come, because he has weapons himself. |

Saldivar immediately objected to Ruelas's testimony and moved for a mistrial, arguing that Ruelas violated the admonishments that the court gave earlier. The trial court overruled the objection and denied the motion. Saldivar then requested the court to instruct the jury to disregard the portion of Ruelas's statement concerning weapons. The court denied the instruction.

Saldivar was found guilty as charged, and this appeal ensued.

## II.    DISCUSSION

By his sole issue on appeal, Saldivar argues that the trial court abused its discretion by denying his motion for mistrial. He contends that Ruelas's statement that he "has weapons himself" is "highly inflammatory and prejudicial" and influenced the jury's guilty verdict.[4]

---

[4] In arguing that the motion for mistrial was improperly denied, Saldivar treats the court's denial of an instruction to disregard as a factor in his analysis. However, he does not present a separate issue arguing that the court erred in denying the instruction, and he does not provide any legal argument which would support such an issue. Accordingly, we will not analyze the trial court's denial of the instruction as a separate error and will only consider it as a factor in our analysis of whether the court erred in denying a mistrial. *See* TEX. R. APP. P. 38.1(i), 47.1; *Bolling v. Farmers Branch Indep. Sch. Dist.*, 315 S.W.3d 893, 895 (Tex. App.—Dallas 2010, no pet.) ("[An appellate court is] not responsible for doing the legal research that might support a party's contentions.").

## A.    Applicable Law & Standard of Review

"A mistrial is an appropriate remedy in 'extreme circumstances' for a narrow class of highly prejudicial and incurable errors." *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009) (quoting *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004)). "Because it is an extreme remedy, a mistrial should be granted 'only when residual prejudice remains' after less drastic alternatives are explored." *Ocon*, 284 S.W.3d at 884–85 (quoting *Barnett v. State*, 161 S.W.3d 128, 134 (Tex. Crim. App. 2005)). Even if inadmissible testimony or other evidence comes before the jury, "our law prefers that the trial continue" unless the evidence "is so emotionally inflammatory that curative instructions are not likely to prevent the jury being unfairly prejudiced against the defendant." *Bauder v. State*, 921 S.W.2d 696, 698 (Tex. Crim. App. 1996).

We review a trial court's denial of a motion for mistrial under an abuse of discretion standard. *Archie v. State*, 340 S.W.3d 734, 738–39 (Tex. Crim. App. 2011). In reviewing a trial court's ruling on a motion for mistrial, we must uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Archie*, 221 S.W.3d at 699; *Ocon*, 284 S.W.3d at 884 (citing *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004)). An appellate court views the evidence in the light most favorable to the trial court's ruling, considering only those arguments before the court at the time of the ruling. *Ocon*, 284 S.W.3d at 884.

While the parties agree that a trial court's denial of a mistrial is reviewed under the abuse of discretion standard, the parties' briefs differ in their application of the standard. Saldivar argues that the court should balance three factors established in *Mosley v. State*: (1) the severity of the misconduct (i.e., the prejudicial effect), (2) curative measures by

the court, and (3) the certainty of conviction absent the misconduct. 983 S.W.2d 249, 259 (Tex. Crim. App. 1998). The State argues that the harm analysis set out in Texas Rule of Appellate Procedure 44.2(b) applies and the three aforementioned factors do not apply. *See* TEX. R. APP. P. 44.2(b) ("Any [non-constitutional] error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). Specifically, the State argues that "the *Mosley* factors apply in only two scenarios: (a) when the motion for mistrial is based on improper jury argument in a case in which constitutional rights are not implicated, and (b) when the motion for mistrial occurs in the punishment phase of a non-capital case."[5]

The considerations under both analyses are similar, if not the same. *Archie*, 221 S.W.3d at 700–01 ("[W]hether a mistrial should have been granted involves most, if not all, of the same considerations that attend a harm analysis." (quoting *Hawkins*, 135 S.W.3d at 77)); *see Hallman v. State*, 647 S.W.3d 805, 825 (Tex. App.—Fort Worth 2022, pet. granted); *Young v. State*, 591 S.W.3d 579, 595 (Tex. App.—Austin 2019, pet. ref'd); *Benefield v. State*, 389 S.W.3d 564, 571 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd). However, we will apply the three *Mosley* factors because there is well-established precedent for using the factors outside of the State's two proffered scenarios. *See, e.g.*, *Ramon v. State*, 159 S.W.3d 927, 928–29 (Tex. Crim. App. 2004) ("*Mosley* involved prosecutorial misconduct in the form of improper jury argument, but the holding is equally

---

[5] There is some merit to this interpretation. *See Hallman v. State*, 647 S.W.3d 805, 845 (Tex. App.—Fort Worth 2022, pet. granted) (Womack, J., dissenting) ("[I]t is not clear whether the use of the *Mosley* factors is appropriate for the issue raised in this appeal. The *Mosley* factors seem to be chiefly utilized in cases involving a motion for mistrial following improper argument by a prosecutor."); *see also Garcia v. State*, No. 10-12-00202-CR, 2013 WL 3482009, at *1 (Tex. App.—Waco July 11, 2013, pet. ref'd) (mem. op., not designated for publication) ("Because the Court of Criminal Appeals has not adopted the *Mosley/Hawkins* factors in evaluating the denial of a motion for mistrial pursuant to any reason other than improper argument . . . we do not use those factors in our review."). However, we decline to adopt this interpretation for the reasons set forth in this opinion.

applicable to the prosecutor's testimony in this case."); *Flores v. State*, 513 S.W.3d 146, 153 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (using *Mosley* factors to determine whether the trial court abused its discretion when denying a mistrial for improper witness testimony); *Perez v. State*, 187 S.W.3d 110, 112 (Tex. App.—Waco 2006, no pet.) (using *Mosley* factors to determine whether the trial court abused its discretion when denying a mistrial for an improper witness answer that implicated constitutional rights).[6]

## B.    Analysis

Under *Mosley*, the first factor we look to is the severity of the conduct, which by necessity inquires into the prejudicial effect of the statement. *Hawkins*, 135 S.W.3d at 77–78 ("Prejudice is clearly the touchstone of the first factor in the *Mosley* test."). Saldivar argues that the prosecutor's question, "And did you take any safety precautions just in case?" and Ruelas's response, that she was "scared that [Saldivar] was going to come, because he has weapons himself," constituted a "deliberate effort to inflame the jury and deprive [Saldivar] of a fair and impartial trial."

Prior to trial, both parties agreed that allegations of Saldivar's abuse of Ruelas, including an incident where Saldivar "pointed a firearm" at her or incidents "involving other [adult] females" were irrelevant "unless somehow the door [was] open[ed]." The court granted defense counsel's request and specifically prohibited Ruelas from testifying to any "incidents involving guns" unless she received permission from the court. According to Saldivar, the State and Ruelas should therefore have known that any testimony

---

[6] *See also Yancy v. State*, No. 13-22-00232-CR, 2023 WL 3526116, at *4 (Tex. App.—Corpus Christi–Edinburg May 18, 2023, no pet.) (mem. op., not designated for publication); *Morin v. State*, No. 13-18-00149-CR, 2020 WL 582157, at *13 (Tex. App.—Corpus Christi–Edinburg Feb. 6, 2020, no pet.) (mem. op., not designated for publication); *Lyne v. State*, No. 13-13-00313-CR, 2015 WL 5672692, at *3 (Tex. App.—Corpus Christi–Edinburg Sept. 17, 2015, no pet.) (mem. op., not designated for publication); *Dominguez v. State*, No. 13-10-00218-CR, 2010 WL 5541708, at *2 (Tex. App.—Corpus Christi–Edinburg Dec. 30, 2010, no pet.) (mem. op., not designated for publication).

showing that Saldivar owned a gun was similarly irrelevant and prejudicial. The State argues that Ruelas did not technically breach the admonishments because "[s]he did not testify to abuse, or any incident involving guns," but rather, she was testifying that "both she and [Saldivar] each possessed weapons." We agree with the State. The trial court did not admonish Ruelas not to testify about Saldivar's mere possession of a gun or weapon, and defense counsel never asked for such an admonishment. Furthermore, Ruelas did not testify about an "incident" involving guns because her testimony was about her preparation to confront Saldivar—a confrontation that never occurred. Finally, even if Ruelas did breach the admonishments, the State did nothing to emphasize the testimony concerning weapons, and it did not mention the testimony in its closing argument. *See Martinez v. State*, 17 S.W.3d 677, 693 (Tex. Crim. App. 2000); *Perez*, 187 S.W.3d at 112–13 (considering whether the mistake was repeated, whether it seemed inadvertent or intentional, and the nature of the right affected in the court's analysis of the first *Mosley* factor). This factor weighs against a mistrial.

The second factor we consider are the measures the trial court adopted to cure the statement from coming in at trial. *See Mosley*, 983 S.W.2d at 259. A prompt instruction to disregard will ordinarily cure error associated with improper testimony. *See Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000). Although we agree with the State that the testimony did not violate the trial court's admonishment, we will assume without deciding that the testimony was otherwise irrelevant and possibly prejudicial. Here, the trial court provided no curative instruction. Therefore, the trial court's refusal to take any corrective measures weighs in favor of a mistrial.

11

Nevertheless, any prejudicial effect that the testimony may have had was minuscule when compared to the strength of the evidence supporting the conviction. As to the certainty of conviction absent the misconduct, the third factor, we note that the testimony of a victim of a sexual offense alone is sufficient to support a conviction for sexual assault of a child. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07(a), (b)(1); *Flores*, 513 S.W.3d at 167. Here, the jury heard direct testimony from B.A.S. detailing three different acts of abuse perpetrated by Saldivar and heard testimony from two of her brothers that confirmed her emotional state after one of those incidents. The jury also heard testimony about her outcry to her mother, testimony from a coordinator at CAART, and the police detective for the case. It is unlikely that one witness's single sentence about an ancillary issue over a two-day trial affected the jury's verdict. *See Flores*, 513 S.W.3d at 167 ("It is unlikely that the jury's decision to convict was influenced by the pediatrician's testimony that he believed complainant's story to be credible—the same story the jury heard from complainant."); *Perez*, 187 S.W.3d at 111–13 (holding that the trial court did not abuse its discretion in denying the motion for mistrial based on the one instance of improper witness testimony). This factor weighs against a mistrial.

Overall, we cannot conclude that the prejudicial effect of Ruelas's statement was so severe as to prevent Saldivar from receiving a fair and impartial trial. *See* TEX. R. APP. P. 21.3(g), (h); *Flores*, 513 S.W.3d at 175. The heart of the case came down to B.A.S.'s credibility. *See Hammer v. State*, 296 S.W.3d 555, 561–62 (Tex. Crim. App. 2009) ("Sexual assault cases are frequently 'he said, she said' trials in which the jury must reach a unanimous verdict based solely upon two diametrically different versions of an event, unaided by any physical, scientific, or other corroborative evidence."). In this regard,

though Saldivar presented two witnesses that testified that B.A.S. lied in the past and presented evidence of a potential motive for B.A.S. to lie, the jury is the "exclusive judge of the credibility of witnesses and of the weight to be given their testimony." *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000) (quoting *Barnes v. State*, 876 S.W.2d 316, 321 (Tex. Crim. App. 1994)); *see Guevara v. State*, 667 S.W.3d 422, 434 (Tex. App.—Beaumont 2023, pet. ref'd).

In considering the three *Mosley* factors, we find that the trial court's failure to give a corrective instruction, balanced with Ruelas's testimony and the evidence at trial, was not so harmful as to warrant a mistrial. Accordingly, the trial court did not abuse its discretion in denying Saldivar's motion for mistrial.

## III.    CONCLUSION

The trial court's judgment is affirmed.

DORI CONTRERAS
Chief Justice

Publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
14th day of September, 2023.